# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| FAIR GAMING ADVOCATES MA LLC, <br><br> *Plaintiff*, <br><br> vs. <br><br> VGW HOLDINGS LIMITED, <br><br> VGW MALTA LIMITED, <br><br> VGW LUCKYLAND INC., and <br><br> VGW US, INC. <br><br> *Defendants*. | Civil Action No.: |

## **COMPLAINT**

Plaintiff FAIR GAMING ADVOCATES MA LLC brings this action on behalf of itself as permitted by Chapter 137, § 1 of the Massachusetts General Laws (hereinafter "M.G.L. c. 137, § 1") against Defendants VGW HOLDINGS LIMITED, an Australian company; VGW MALTA LIMITED, a Maltese company; VGW LUCKYLAND INC., a Delaware corporation; and VGW US, INC., a Delaware corporation (collectively, "Defendants").

## **BACKGROUND**

1. Defendants own and operate what they claim are video game development businesses and cashless "social casino[s]." In reality, Defendants have created, own, and operate popular unlicensed virtual casinos, including real virtual casino games offered under the names "Chumba Casino" ("Chumba") and "Luckyland Slots" ("Luckyland").

2. "Luckyland Slots" games are reportedly owned and operated by VGW LUCKYLAND INC., VGW US, INC., and affiliates (the "Luckyland Defendants"); while "Chumba

1

Casino" games are reportedly owned and operated by VGW MALTA LIMITED and affiliates (the "Chumba Defendant"). However, VGW LUCKYLAND INC., VGW US, INC., and VGW MALTA LIMITED each are <u>wholly</u> owned and controlled by VGW HOLDINGS LIMITED.

3. VGW HOLDINGS LIMITED, in turn, is an Australian company reporting annual revenues in the <u>billions</u> (of Australian dollars) which is owned and controlled primarily by a single individual Laurence Escalante who holds a majority equity interest of over 60% in VGW HOLDINGS LIMITED.

4. Defendants have represented to the public and to various financial institutions, such as banks and credit card processing companies, that Defendants operate video game or arcade websites permitting "just for fun" gameplay. However, Defendants intentionally operate websites that are actually unlicensed internet gambling casinos where customers and consumers <u>wager</u> and <u>lose</u> real money on slot machines from the comfort of their Massachusetts residences. Defendants thinly veil this unlicensed (and illegal) gambling operation by characterizing components of their offerings as "sweepstakes."

5. Initially, in exchange for "real money" from consumers, Defendants sell virtual currency, dubbed "coins", that can be used to wager on games of chance for fun. However, Defendants have established a scheme to deprive consumers of money by enticing consumers with the potential to win "real money" prizes. Defendants use the "coins" concept to entice Massachusetts consumers while hiding that Defendants are engaging in real money gambling, all while misleading regulators and Massachusetts residents about the true nature of Defendants' business.

6. This has been the *modus operandi* of Defendants for over a decade. As early as 2012, the billionaire founder, CEO, and controlling shareholder of Defendants Laurence Escalante expressed his intent to create virtual gambling casinos that would offer United States consumers the opportunity to gamble online with "virtual currency" at a time when "real money" gambling could only be offered to those consumers outside of the United States. Mr. Escalante and Defendants have held and publicized this business plan and their goal to combine "virtual currency and gambling" from 2012 through the present. See, e.g., a video presentation of this publicized intent at https://www.youtube.com/watch?v=M-ekhp92V-0&list=PPSV.

7. For at least the last several years, Defendants have marketed and operated an online "real money" gambling casino within Massachusetts, a large market known for having extensive restrictions on gambling.

8. In Massachusetts, as in other states, Defendants target and entice visitors and consumers to play on their sites by offering a "free-to-play" option where players receive a bundle of free "Gold Coins" to play their casino games—on a website or app where every game is a game of chance. After Massachusetts consumers inevitably lose these free coins, they are prompted to purchase more if they wish to continue playing.

9. After Massachusetts consumers have paid for additional "Gold Coins", they continue to wager to win more "Gold Coins". The "coins" won by paying consumers playing Defendants' game of chance are identical to the "coins" Defendants sell. Therefore, by wagering "coins" that were purchased consumers have the chance to win additional coins that they would otherwise have had to purchase to utilize Defendants site.

3

10. "Gold Coins" cannot be redeemed by consumers for "real money." However through the process described in paragraphs 8 and 9, Defendants introduce the Massachusetts consumer to their site and the consumer expends money to play casino games of chance for the experience of the game. The exclusive purpose of selling consumers the "Gold Coins" is to cause consumers to play the Defendants' games of chance. It is very difficult for consumers to play Defendants' games without purchasing "Gold Coins" and impossible to play any of the games without maintaining a balance of coins for wager.

11. Defendants simultaneously offer "real money" gambling to Massachusetts residents on the same websites as the "Gold Coin" gambling, using a separate virtual currency titled "Sweeps Coins." By purchasing "Sweeps Coins", Massachusetts residents can convert their experience on Defendants' sites into a more traditional gambling model where the consumer wins (or more often, loses) "real money."

12. By calling these coins "Sweeps Coins" and this gambling process a "sweepstakes", Defendants improperly attempt to evade the direct ire of law enforcement in other, non-Massachusetts states where unlicensed online gambling is illegal but online "sweepstakes" are allowable.

13. This online casino scheme has been wildly profitable for Defendants as a whole. According to finance statements provided to its shareholders and Australian security regulators in the year ended June 30, 2023, VGW HOLDINGS LIMITED (reporting consolidated revenues on behalf of all subsidiaries) reported approximately $4,835.1 million (AUD) in revenue and spent $360.0 million on marketing alone. That same year, VGW Holdings reported "promotional sweepstakes prizes" of $3,355.5 million.

14. It is impossible to know precisely how much Massachusetts consumers have lost to Defendants, as Defendants consolidate their audited financial statements globally and neglect to include any geographic breakdowns on said statements.

15. However, Defendants actively advertise to and engage with hundreds, thousands, or more Massachusetts consumers.

## JURISDICTION AND VENUE

16. The courts of Massachusetts have personal jurisdiction over Defendants pursuant to M.G.L. c. 223A, § 3 because this claim arises from Defendant's transaction of business in this Commonwealth, arises from the supplying of services by Defendant in this Commonwealth, and alleges a tortious injury caused by an act outside of the Commonwealth by Defendants who regularly solicit and do business and engage in persistent course of marketing and derive substantial revenue from services rendered in this Commonwealth.

17. This Court has jurisdiction over the subject matter of this action pursuant to M.G.L. c. 212, § 3, because it is a court of general jurisdiction and the damages sought by Plaintiff far exceed $50,000.

18. Venue is proper in this county pursuant to the Massachusetts General Laws because a substantial part of the events giving rise to the claims asserted herein occurred in this county, because Defendants committed acts that are the bases of this lawsuit in this county, and because no party "lives in" the Commonwealth as that phrase is used in M.G.L. c. 223, § 1.

## PARTIES

19. Plaintiff is an "any other person", who in accordance with M.G.L. c. 137, § 1 "Recovery of money or goods lost at gaming; limitations", "…may sue for and recover in tort treble the value thereof" the losses suffered by Massachusetts residents to unlicensed "cards, dice, or other game, or by betting on the sides or hands of those gaming…or…pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet[.]"

20. VGW HOLDINGS LIMITED ("VGW Holdings") owns and operates internet gambling websites and apps that are available to and utilized by residents of Massachusetts and owns and operates subsidiary entities that in turn also own and operate such internet gambling websites and apps.

21. VGW Holdings is an Australian "Public Company" not listed for public trading and which is majority owned (over 60% ownership and voting control) by Mr. Laurence Escalante. Mr. Laurence Escalante is a Director of VGW HOLDINGS LIMITED.

22. On information and belief, VGW Holdings maintains offices in Perth, Australia.

23. VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW US, INC. each jointly and independently own and operate internet gambling websites and apps that are available to and utilized by residents of Massachusetts. These three entities are each 100% owned and controlled by VGW Holdings.

24. Mr. Laurence Escalante is also a Director and/or Manager of VGW MALTA LIMITED, and on information and belief a Director or Manager of VGW LUCKYLAND INC., and VGW US, INC.

6

25. VGW MALTA LIMITED ("VGW Malta") is a Malta Limited Liability Company which is 100% owned and controlled by VGW Holdings.

26. On information and belief, VGW Malta does not have an office.

27. VGW LUCKYLAND INC. ("VGW Luckyland") owns and operates an office at 442 Post. St., Floor 9, in San Fransisco, California and is incorporated in the state of Delaware. VGW Luckyland is 100% owned and controlled by VGW Holdings.

28. VGW US, INC. ("VGW US") is a Delaware corporation which is 100% owned and controlled by VGW Holdings.

29. VGW Holdings, VGW Malta, VGW Luckyland, and VGW US each conduct business throughout this county, the Commonwealth of Massachusetts, and the United States of America.

30. VGW Holdings, VGW Malta, VGW Luckyland, and VGW US each have customers from this county, the Commonwealth of Massachusetts, and throughout the United States of America, and regularly solicit business and consumers by marketing throughout the same.

## FACTUAL ALLEGATIONS

I.    **Free-to-Play, the New Era of Online Gambling and the Defendants**

31. Defendants utilize a so-called "free-to-play" business model with the goal of manipulating consumers and enticing them to spend real money on familiar casino games of chance-based hope.

32. "Free-to-play" video games have experienced immense growth thanks to the proliferation of Internet-connected mobile devices. Free-to-play game developers do not expect to produce products without a revenue stream—rather the consumer can download and

(initially) play games for free but is later enticed to purchase low-cost virtual items from within the game itself. Games using this model generally charge prices for content as low as $0.99 (often dubbed "microtransactions") instead of charging an up-front fee, and developers make profits by selling thousands of low-cost virtual items.

33. The free-to-play model is a proven method whereby developers can generate huge profits. This business model has become attractive to the developers of games of chance in particular, who offer games such as online automated blackjack or slot machine mobile video games.

34. Defendants and other developers of games of chance quickly became aware of how these business models could be adapted and used to exploit the same psychological triggers used by brick-and-mortar casinos. As reported by one respected video game publication:

> If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item.

PC Gamer, Microtransactions: the good, the bad and the ugly,

http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Oct. 15, 2023).

35. Another respected video game magazine reported in 2023 on the rise and danger of such use of "microtransactions", free-to-play business models, and the implementation of casino-style gambling using "microtransactions":

> [M]any new mobile and social titles target small, susceptible populations
> for large percentages of the revenues. If ninety-five people all play a [free
> to play] games without spending money, but five people each pour $100
> or more in to obtain virtual currency, the designer can break even. These
> five individuals are what the industry calls whales, and we tend not to be
> concerned with how they're being used in the equation. While the scale
> and potential financial ruin is of a different magnitude, a similar
> profitability model governs casino gambling.

Game Informer, How Microtransactions Are Bad For Gaming – Features,

https://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-

are-bad-for-gaming.aspx (last visited Oct. 19, 2023).

36. Academics have studied the socioeconomic effect that free-to-play games have on

consumers. In one study, authors evaluating several sources analyzing "free-to-play"

"casino games" of chance concluded that these virtual gambling sites can have a similar

deleterious effect on consumers and lead to treatment for real-life gambling disorders:

> [Researchers] found that [free-to-play] casino gamers share many similar
> sociodemographic characteristics (e.g., employment, education, income) with
> online gamblers. Given these similarities it is perhaps not surprising that a
> strong predictor of online gambling is engagement in [free-to-play] casino
> games.  Putting a dark line under these findings, over half (58.3%) of
> disordered gamblers who were seeking treatment stated that social casino
> games were their first experiences with gambling.
> […]
> According to [another study] the purchase of virtual credits or virtual items
> makes the activity of [free-to-play] casino gaming more similar to gambling.
> Thus, micro-transactions may be a crucial predictor in the migration to online
> gambling, as these players have now crossed a line by paying to engage in
> these activities. Although, [sic] only 1-5% of [free-to-play] casino gamers
> make micro-transactions, those who purchase virtual credits spend an average
> of $78. Despite the limited numbers of social casino gamers purchasing virtual
> credits, revenues from micro-transactions account for 60% of all [free-to-play]
> casino gaming revenue. Thus, a significant amount of revenue is based on
> players' desire to purchase virtual credits above and beyond what is provided
> to the player in seed credits.

9

Hyoun S. Kim, Michael J. A. Wohl, et al., Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors, Journal of Gambling Studies (co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming) (Nov. 14, 2014), available at http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (last visited April 5, 2023).

37. The same authors looked at the link between playing free-to-play games of chance and gambling casinos. They stated that "prior research indicated that winning large sums of virtual credits on social gaming sites was a key reason for [consumers] migration to online gambling[.]" The largest prediction that a consumer will transition to online gambling was "microtransaction engagement" according to these authors. They found that "the odds of migration to online gambling were approximately eight times greater among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."

38. Defendants exploit these well-established consumer tendencies to manipulate Massachusetts consumers to transition from playing their introductory "free-to-play" game into spending real dollars on virtual "coins" used to veil real money gambling.

## II.    Defendants' Games

39. Defendants operate two popular casino-oriented Internet game brands and websites. These brands and offerings are "Chumba Casino" reportedly operated by the Chumba Defendant; and "Luckyland Slots" operated by the Luckyland Defendants.

40. Both Chumba Casino and Luckyland Slots are operated in a substantially similar way, and each brand operated by a collaboration including some or all Defendants. Therefore

10

the allegations in this Complaint are alleged to have occurred on each and every

"Chumba Casino" or "Luckyland Slots" brand, website, or game regardless of which

Defendant(s) operated individual games or websites (collectively referred to as "games"

or "Defendants' games").

41. When consumers visit Defendants' websites and games, consumers are awarded an initial

allocation of "free" coins. Consumers are offered two different types of coins on

Defendants' sites: "Gold Coins" (hereinafter referred to as "GC") and "Sweeps Coins"

(hereinafter referred to as "SC", or collectively, the "coins").

42. Massachusetts consumers also receive one or both types of coins as a free daily bonus

once-a-day when logging on to their accounts. An example of the popup message for this

"Daily Bonus" is below:

11

43. Consumers can play games on the platform in "standard mode," or "standard play," using GC or play in "promotional mode" or "promotional play," using SC. Consumers may



Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

switch between these two modes as easily and frequently as they like. An example of the

toggle button permitting this switching is shown below:



44. It is only possible to play Defendants' games through the wagering of either GC or SC. It

is impossible for a consumer to play Defendants' games when the consumer does not

have a balance of coins in an account with Defendants.

45. When consumers play in "standard mode" or "standard play" they can win or lose GC.

Routinely after they begin playing, consumers quickly lose their allotments of GC. This

is because the consumer is playing games of chance which are skewed heavily in favor of

Defendants—just like in a brick-and-mortar casino. The longer a consumer plays

Defendants' games the more likely Defendants will ultimately win and the consumer will

exhaust his or her coins.

46. Immediately after the GC are exhausted, when consumers attempt to continue playing

Defendants inform consumers that they have insufficient coins to place a wager,

preventing them from continuing to play the current game. On Chumba Casino users are

presented with the message below instructing them to purchase more GC to keep playing:

13



47. Upon clicking "Buy Gold Coins" on Chumba Casino consumers are redirected to the "Store" where they can purchase more GC. Most purchase options presented to the Massachusetts consumer are offered as a package including SC with the purchase of GC. Unlike GC, the SC are prominently highlighted by the Defendants in green on both Chumba Casino and Luckyland Slots (a color commonly associated with money). An example of the Chumba Casino Store is shown below:



48. When users on Luckyland Slots are out of GC, they are shown a purchase screen where every package includes SC. On this screen depicted below, SC are similarly referred to in green text:

15



49. The same process occurs for consumers playing for real money in "promotional play" or "promotional mode." After attempting to play a game with insufficient SC in their account the consumer is redirected to the Store to purchase more GC and SC. The consumer is shown the same messages depicted in the paragraphs above and is effectively instructed that the purchase of a package including GC and SC is required to continue playing.

50. Regardless of which mode the consumer is using ("promotional play" or "standard play"), the Massachusetts consumer must purchase additional coins if the consumer wishes to continue playing. Consumers are presented with options to purchase additional GC and purchase packages and prices can vary. For example, Chumba generally offers packages in ranges from $1.00 for 200,000 GC to $1,000 for 400,000,000 GC. SC provided with each package generally tracks the amount of "real money" spent on GC. For example, a $10.00 purchase of 40,000 GC typically includes the purchase of 10 SC

16

coins. "Bonus" SC are often provided with larger purchase amounts to entice consumers to make larger purchases.

51. Consumers can resume playing Defendants' games with new GC and SC. If the consumer wins GC, the consumer can use GC to continue playing games "for fun." Inevitably, consumers eventually lose their entire GC balance and must spend more money to continue playing the games "for fun." However, Defendants far more heavily advertise and promote the ability of consumers to receive SC or real money and the ability of the consumers to receive SC for their purchase.

52. For example, Defendants regularly show video advertisements on Facebook to Massachusetts consumers where "winners" of Defendants' games display comically-sized cash checks and discuss their prizes. A still from one such video advertisement displayed to Massachusetts consumers browsing Facebook in October 2023 is depicted below:



53. The process is the same for playing with Sweeps Coins (SC) as well. The only, critical difference being that Sweeps Coins <u>can be redeemed for cash or real money with an exchange rate of one SC to one dollar</u>.

54. This offering of a conversion back to U.S. dollars ups the stakes for consumers and is the mechanism through which Defendants' games use the allure of "free-to-play" initial offerings to manipulate Massachusetts consumers into spending, gambling, and losing <u>real</u> money.

55. Defendants, from time-to-time, offer free coins to entice consumers to play Defendants' casino games. Defendants prey on well-known consumer tendencies towards scientifically recognized gambling addiction. Consumers inevitably lose the free coins provided to them, which stimulates many consumers to purchase more coins necessary to play by redirecting those users to the game's Store. Both "standard play" and "promotional play" modes using GC or SC utilize such tactics.

56. Defendants' games in their Terms of Service agreements claim erroneously that GC have "no monetary value". However this position clashes with Defendants' own financial statements to shareholders which claim "player purchases of gold coins are recognized over time as revenue based on the player retention period and amortized accordingly." GC have independent value to the consumer as they require GC to play additional games of chance. While other popular games offer purchases simply to enhance the video game experience, purchasing coins from Defendants' games is an effective price-of-admission to enjoying Defendants' offerings.

57. In addition to the same system described in the previous paragraph and as further described in paragraphs 103-104, SC purchases are recognized as a partial liability on the financial statements of VGW Holdings, as "a liability for cashable sweepstakes."

58. The equivalency of using GC to real money gambling is made clearer with a hypothetical. If a consumer spends $20.00 on 5,000,000 GC, that effectively values GC at approximately 100,000 per $0.40. If the consumer wagers 100,000 GC on a pull of a slot machine or spin of a digital roulette wheel, that consumer may be lucky and win 500,000 GC, which the consumer can use to continue playing in lieu of making an additional GC purchase. In other words, absent this win the 500,000 GC would have cost the consumer an additional $2.00 to purchase. When consumers wager GC they are exclusively wagering to win more GC to continue playing—and win money in the form of avoiding a future purchase of GC. Consequently, even the wagering of GC alone is still unlicensed gambling.

59. Moreover, with the gambling of SC in promotional mode it is extremely clear that victims are directly gambling with real money. Gambling of SC is where Defendants make the lion's share of their profits through exploitation of Massachusetts consumers.

60. The Chumba Defendant claims on Chumba Defendant's websites that "Sweeps coins cannot be purchased and [have] no inherent value." _https://www.chumbacasino.com/about-us_.  However, this is flatly disingenuous as the GC purchase packages (depicted in this Complaint) prominently display the amount of SC the consumer receives, and the SC can be redeemed directly to consumers' <u>bank accounts</u> where 1 SC is equal to 1 U.S. dollar. It is no coincidence that at the time of purchase of GC, the amount of SC made available to the consumer is nearly 1-to-1 for the number of

20

dollars spent by the Massachusetts consumer. When a consumer plays SC and has a balance the redemption button is prominently displayed on Defendants' games—clearly identifying that the consumer can redeem the SC for cash (or cash-equivalent gift cards). Below are images of said process on Chumba Casino:







61. Defendants incentivize consumers to continue playing their games, and eventually lose their SC balance by making it difficult for consumers to collect and redeem SC. The minimum permitted redemption amount on Chumba Casino is 100 SC to be redeemed for $100 and on Luckyland Slots is 50 SC to be redeemed for $50. Any balance a consumer has below 100 SC remains "stuck" on the site, a sunk cost encouraging consumers to continue playing Defendants' games. Defendants also only permit one redemption at a time and implement timing delays by adding unnecessary extra steps to separately "approve" and "process" redemptions. These restrictions are designed to further entice consumers to cancel their requests to redeem SC and continue playing Defendants' games. Such techniques or restrictions are not permitted at brick-and-mortar casinos which face regulation by the Commonwealth and must adhere to Code of Regulations chapters that do not reach Defendants' unlicensed games of chance.

62. Defendants use the "free-to-play" business model to entice consumers to play games of chance which are indistinguishable from brick-and-mortar casino games, which are themselves equipped with digital video type gambling machines, ranging in games from blackjack and roulette to slots. Defendants stimulate consumers and entice them to purchase GC after running out of their initial free GC. At that time, Defendants display and highlight (in green, depicted above) the SC that the consumer receives in the purchase package. The consumer is made aware through the site and Defendants' advertising that SC values are equivalent to real money, cementing this casino experience that does not require the Massachusetts consumer to travel to one of the state's three licensed, brick-and-mortar casinos.

63. Massachusetts consumers may accumulate Seeps Coins (SC) in one of several ways:

23

a.  By receiving SC upon the purchase of marked packs of Gold Coins (GC);

b.  By entering occasional "Sweeps Coins no-cost give away contests" on the games' Facebook pages;

c.  By sending a request by mail to an address published by Defendants (in exchange for five SC, or approximately $5.00 worth of SC per request); or,

d.  As a "Daily Bonus" given when logging on to the players account (once per day, in a small amount). See *https://www.chumbacasino.com/sweeps-rules*.

Consumers are highly incentivized to choose option "a", because the other options are less advertised, difficult or slow (taking months to write, send, and receive credits for sending mail requests), or offer truly nominal incentives compared to a purchase (receiving 1 SC/$1.00 per day from the "Daily Bonus" feature).

64. Defendants often arbitrarily reject submissions of mailed requests for SC, contrary to their published rules.

65. On or around September 20, 2023, the Chumba Defendant altered its contractual "Sweepstakes Rules" to make it easier for the Chumba Defendant to refuse mailed requests that take more than 90 days to process or where mailed requests are sent using "handmade envelopes that are not suitable for machine processing". On information and belief, the Luckyland Defendants implemented similar changes to their contractual terms.

66. Players can play the same casino games using SC that they would play with GC. The significant and only difference is that when a consumer plays Defendants' games with GC, a consumer or player can only win or lose GC (whose value exists in allowing consumers to play games without paying additional money), while SC can be redeemed for dollars in the Massachusetts consumer's bank account.

67. Purchases of SC are usually provided by Defendants at a rate slightly above a 1:1 conversion rate. Consumers who purchase more SC at once receive a more favorable exchange rate. A consumer who purchases $5.00 of GC and SC may receive 5.05 SC; where a consumer who purchases $300.00 would receive 315 SC (a difference conversion rate benefitting the consumer making a larger purchase by 5%). This is another tactic utilized by brick-and-mortar casinos—in the form of extra chips and free play, or comped drinks, food, and lodging provided to incentivize players to gamble more and lose more money.

68. Massachusetts consumers are forbidden from immediately redeeming any SC without first using that SC in a wager. Defendants claim that because SC are unable to be redeemed before wagering that they have no "value" and this somehow converts their illegal gambling operation into a "sweepstakes" which can operate legally. In other words, consumers are required to play games of chance and gamble on Defendants' games with SC in order to later redeem any SC and collect a (money) prize. See _https://www.chumbacasino.com/sweeps-rules_.

69. Accumulation of SC by players may provide an incentive for them to purchase GC or SC from Defendants. However, winning any actual money by accumulating Sweeps Coins (SC) through gambling is unrealistic for most players. As these games of chance do not adhere to applicable state law and regulation and these international Defendants evade enforcement, these games may more heavily favor the Defendants than even a brick-and-mortar casino offering the same games.

70. The vast majority of Defendants' games are in the style of a virtual slot machine. Regardless of what type of coins a consumer wagers (SC or GC), once the consumer

"spins" the slot machine by pressing a button on Defendants' slot machine games, none of Defendants' slot machine games allow or call for additional user input. Instead, the consumer's device communicates and sends information to Defendants' servers. Defendants' servers execute the games' algorithms to determine the spin's outcome and report that result back to the consumer's device in Massachusetts.

71. None of the outcomes in Defendants' slot machine games depend on <u>any</u> amount of skill to determine their outcomes, as all outcomes are based entirely on chance.

72. Chumba Casino offers blackjack-style games in which the player makes choices and wagers coins (SC or GC) in a manner nearly identical to placing bets at a traditional blackjack table. The chances of winning are not known or knowable to the consumer as the algorithms employed by Defendants are not public.

73. Defendants maintain win and loss records and account balances for each consumer account.

74. Once Defendants' game algorithm determines the outcome of a wager, Defendants display the outcome to the consumer and adjust the consumer's account balance.

75. Defendants keep records of each wager, outcome, win, and the losses for each and every player and account on Defendants' games.

76. Massachusetts consumers <u>cannot</u> obtain SC through the gambling of GC (and can only obtain SC as described in paragraph 63).

77. Often Consumers will purchase additional packages of GC and SC despite having a large balance of GC remaining. This is because consumers are encouraged by Defendants' business model to focus on wagering SC so they might win "real money" in the form of more SC currency.

78. Defendants use the name "Sweeps Coins" in reference to sweepstakes prizes in an attempt to avoid legal enforcement. In reality, Defendants' games require the purchase of SC using money in order to receive a chance at winning real money. Other methods of obtaining SC result in an award of only nominal amounts of SC for the effort expended by the consumer. In other words, the purchase and redemption of "Sweeps Coins" functions equivalent to "chips" in a brick-and-mortar casino.

79. Contrary to Massachusetts law, Defendants are operating unlicensed, virtual casinos within the Commonwealth of Massachusetts, and Defendants have misrepresented to Massachusetts consumers that the consumers are participating in games that are permitted by Massachusetts law.

80. In reality, Massachusetts consumers are actually gambling or engaging in other prohibited wagered gaming as defined by Massachusetts law.

### III.   Defendant's Targeted Enticement of United States and Massachusetts Consumers

81. Marketing materials for all Defendants' games consistently target Massachusetts residents specifically using advertising that is geographically limited in scope to exclude non-United States residents.

82. Google's Public "Ad Transparency Center" (https://adstransparency.google.com/?region=US) reports that VGW Luckyland and VGW US have each placed hundreds of video, text, and image ads throughout the United States, on behalf of both the Chumba Casino and Luckyland Slots brands. The Ad Transparency Center states that each "[a]dvertiser has verified their identity" with documentary evidence. Limiting ads of Defendants' on Google's Ad Transparency

27

Center to those displayed only in the United States by VGW Luckyland and VGW US lists hundreds of ads.

83. Online advertising tools such as Google Ads would allow for Defendants to exclude Massachusetts residents from seeing Defendants' ads easily, but Defendants do not utilize any such exclusions.

84. Defendants have placed hundreds of ads displayed to United States and Massachusetts residents using Google's online advertising services.

85. Defendants and Defendants' games also actively use social media to advertise to Massachusetts consumers.

86. For example, Massachusetts residents using the popular social media app Facebook are served video and image advertisements while using the Facebook site.

87. Facebook also allows advertisers to limit their advertisements geographically, but Defendants choose to serve advertisements for illegal gambling to residents of the Commonwealth on Facebook.

88. Defendants' advertisements often include themes such as: describing individuals who have won real money on Defendants' games (often holding a comically-sized check as depicted in paragraph 52), showing games of chance such as a slot machine being played, or engaging with United States-based social media "influencers" with great reach.

89. Finally, Defendants often partner with United States-based "influencers" or internet celebrities in order to further entice Massachusetts residents to engage with Defendants' games.

90. For example, Defendants publish a game called "Brian Christopher Slots" which depicts and is marketed in collaboration with the eponymous Brian Christopher. Brian

28

Christopher is an online personality indicated in Luckyland's own marketing materials to reside in "Palm Springs, California." *See* https://www.bcslots.com/about.html, https://www.bcslots.com/playbcslots.html.

91. Defendants advertise and target Massachusetts residents to participate in their unlicensed gaming through direct marketing on a variety of platforms and media.

IV. **VGW Holdings Limited's Absolute Control Over the Chumba Defendant and Luckyland Defendants, and Mr. Laurence Escalante's Direct Control Over All Defendants.**

92. The directors and officers of VGW Holdings Limited, as of 2022, are: LAURENCE ESCALANTE, MATS JOHNSON, LORENZO ESCALANTE, MICHAEL THUNDER, and PAUL MANALAC (serving as alternate to Lorenzo Escalante since 2019).

93. The directors and officers of VGW Malta, the Chumba Defendant are: LAURENCE ESCALANTE, CHISTOPHER VELLA, AND NICOLE SPITERI BAILEY.

94. The corporate officers of VGW Luckyland and VGW US are not public and not ascertainable to the plaintiff. On information and belief, Mr. Laurence Escalante is a director of both VGW Luckyland and VGW US.

95. On June 30, 2022, VGW Holdings filed a financial statement with the Australian Securities & Investments Commission which was audited by Grant Thorton Audit Pty Ltd. (the "VGW 2022 Financials"). Exhibit A.

96. Per the VGW 2022 Financials, VGW Holdings recognized revenues from "Luckyland Slots" and "Chumba Casino" on its audited annual financial statements.

29

97. Per the VGW 2022 Financials, VGW Holdings reported full (100% effective) ownership and control over VGW LUCKYLAND INC., VGW US, INC. and VGW MALTA LIMITED.

98. Per the VGW 2022 Financials, Note 20, "VGW Holdings Limited ('the parent') exercises control over its subsidiaries: VGW Malta Holding Ltd., VGW Malta Limited, VGW US, Inc., VGW Luckyland Inc., … [and] VGW Corporation Pty Limited. … The parent and the subsidiaries are collectively referred to as the 'consolidated entity' and are constituent parts of these consolidated financial statements. Accordingly, the subsidiaries are considered as related parties in the separate financial statements of the parent entity rather than in the consolidated financial statements."

99. Additionally, per VGW 2022 Financials, Note 11, "The subsidiaries [VGW Malta Limited and VGW Luckyland Inc.] have share capital consisting solely of ordinary shares which are held directly by [VGW Holdings Limited]. The assets of the subsidiaries have been consolidated on a line-by-line basis in the consolidated financial statements of [VGW Holdings Limited]. The proportion of ownership interests equals the voting rights held by [VGW Holdings Limited]."

100. Per the VGW 2022 Financials lines cited in the paragraph above, VGW Malta and VGW Luckyland are not reported as independent streams of revenue on the VGW Holdings financial statement, despite being separate corporate entities providing payments to VGW Holdings. As such it is impossible to tell at this time what proportions of their revenues VGW Luckyland or VGW Malta provide to VGW Holdings.

101. Per the VGW 2022 Financials, VGW reported to shareholders for the 2022 fiscal year—revenue from "Chumba Casino" in the amount of $2,480,654,000.00 Australian

30

Dollars and revenue from "Luckyland Slots" of $779,378,000.00 Australian Dollars,

followed by the sentence "The majority of the Group's customers are based in North

America."

102.   The sum of the revenue reported on the VGW 2022 Financials attributable to "Chumba

Casino" and "Luckyland Slots" in the previous paragraph is $3,260,032,000.00

Australian Dollars (the "Defendants' Games Revenue") ($2,480,654,000.00 plus

$779,378,000.00).

103.   Per the VGW 2022 Financials, VGW reported expenses of $2,288,975,000.00 in the

category "[s]weepstakes prizes" ("Defendants' Games Prize Expenses").

104.   Dividing Defendants' Games Revenue by Defendants' Games Prize Expenses (as

defined above) reveals that Defendants' Games likely provide approximately 70.21%

return to consumers.

105.   Brick-and-mortar casinos in Massachusetts are required by law to offer electronic slot

machine games with an 80% or higher return to consumers. See 205 CMR 143.01(1)(k).

106.   The Luckyland Defendants from time-to-time advertise a return to consumers of over

90% on particular Luckyland Defendants' games.

107.   The majority of VGW Holdings customers are in North America, per the VGW 2022

Financials. See Ex. A, Director's Report, "Principal activities" ("The majority of the

[VGW] Group's customers are based in North America.)

108.   VGW Holdings executives receive large amounts of compensation in the form of

VGW HOLDINGS LIMITED equity. Per VGW 2022 Financials, pg. 7, VGW Holdings

has "issued a Short-Term Incentive Plan (STI) for its executives." See Ex. A.

109.  On December 21, 2021, Lawrence Escalante as Director of VGW Holdings filed a document titled "VGW Modern Slavery Statement 2021" with the Australian Securities & Investments Commission (the "Statement"). Exhibit B.

110.  Per the Statement, VGW Holdings and its subsidiaries collectively employ 745 employees.

111.  Per the Statement, "The recruitment process of VGW Group personnel is predominantly conducted from VGW's office in Perth, Western Australia."

112.  Per the Statement, VGW Holdings provides support to its subsidiaries in making hiring decisions.

113.  Per the Statement, VGW Holdings provides support to its subsidiaries in the form of services from independent contractors in the Philippines and Romania.

114.  VGW Holdings has the same real owners as VGW Malta, VGW US, and VGW Luckyland (collectively, the "Subsidiaries"), as VGW Holdings Limited effectively owns 100% of the interests of both Subsidiaries.

115.  VGW Holdings has pervasive control over the Subsidiaries as it effectively controls 100% of the voting interests of each Subsidiary.

116.  Substantially all or all of the Subsidiaries value and revenues are passed on to the owners of VGW Holdings, including Mr. Laurence Escalante who on information and belief holds at least 60% equity in VGW Holdings.

117.  VGW HOLDINGS LIMITED consolidates each Subsidiary on its annual audited financial statements.

118.  The Subsidiaries share directors and intermingle their corporate recordkeeping, accounts, and decision-making functions with VGW Holdings and other Subsidiaries.

32

119.  For example, in 2022 VGW Malta reported on an audited financial statement submitted to the Malta Business Registry on June 30, 2022 that VGW Malta engaged in "related party transactions" within "the VGW Group of Companies" directly involving VGW Malta's accounts totaling over 1,486,488,117€ in internal transactions.

120.  VGW Malta reported only 1,592,902,725€ in "Total Revenue" on its June 30, 2022 Finance Statement, indicating that the value of VGW Malta's related party transactions is 93% of the amount of revenue VGW Malta made for the same reporting period.

121.  On information and belief, each Subsidiary shares some or all board members and directors with VGW Holdings.

122.  Mr. Laurence Escalante is a Director of VGW Holdings and of each Subsidiary (on information and belief as to VGW US and VGW Luckyland).

123.  VGW Holdings created and maintains VGW US, VGW Luckyland, and VGW Malta with the primary purpose of limiting potential liability to VGW Holdings for its knowing, global violations of gambling licensing laws.

## CAUSES OF ACTION

### COUNT I

**VIOLATION OF M.G.L. c. 137, § 1. RECOVERY OF MONEY
OR GOODS LOST AT GAMING; LIMITATIONS.**

**(ALL DEFENDANTS)**

124.  Plaintiff incorporates the foregoing allegations of paragraphs 1-123 as if fully set forth herein and sues Defendants, collectively and each independently, for violations under Massachusetts General Laws, c. 137, § 1.

125.  M.G.L. c. 137, § 1 authorizes "any other person to sue for and recover in tort treble the value" of gambling losses of any Massachusetts citizen.

126.  Specifically, M.G.L. c. 137, § 1 states:

"Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof."

127.  Plaintiff is an "any other person" recognized by M.G.L. c. 137, § 1 (see M.G.L. c. 4, § 7, para. 23) and is authorized to proceed with litigation against Defendants to recover on Plaintiff's own behalf and for Plaintiff's own benefit all losses that the residents of Massachusetts have incurred from utilizing the Defendants' gaming sites that were incurred more than three months and up to a year before this date, and in amount that is treble the value of those losses by Massachusetts consumers.

128.  Defendants' casino games constitute a game of dice, other game, a lottery, drawing, or other betting game as defined by M.G.L. c. 137, § 1 because players in the Commonwealth of Massachusetts have tendered money for the purchase of GC and SC, and then wagered those coins. By an element of chance (*e.g.*, spinning a virtual slot machine, choosing numbers on a roulette table, or playing blackjack) Defendants create a right to credits and other things of value such as SC that can be redeemed directly for money in the bank account of a Massachusetts consumer.

34

129. The wagering by and for Massachusetts consumers of purchased "Gold Coins" (GC) constitutes illegal gaming under M.G.L. c. 137, § 1 because those GC are things of value under Massachusetts law because GC are credits that allow for the extension and the privilege of continuing to play Defendants' games without additional charge.

130. The wagering by and for Massachusetts consumers of purchased "Sweeps Coins" (SC) constitutes illegal gaming under M.G.L. c. 137, § 1 because those SC can be redeemed and purchased directly for cash payments and are the functional equivalent to cash in Defendants' games.

131. As a direct and proximate result from Defendants' operations of their games and virtual casino, hundreds or thousands of Massachusetts residents have suffered losses.

132. Plaintiff is now entitled to recover the monetary losses suffered by all Massachusetts residents lost from wagering at Defendants' games.

133. As a direct and proximate result from Defendants' operation of their games, websites, social media presence, and virtual casinos, Massachusetts residents have paid and delivered money or another thing of value to another person for or in consideration of a lottery, or for or in consideration of a chance of drawing or obtaining any money, prize, or other thing of value in a lottery or policy game, pool, or combination, or other bet, and Plaintiff is now entitled to recover the consideration paid by all Massachusetts residents for or in consideration of a lottery or drawing during the time period allowed by M.G.L. c. 137, § 1.

WHEREFORE, Plaintiff seeks judgement against Defendants for all damages or losses, treble damages or losses, interest, costs, and attorneys' fees that Plaintiff is entitled to by law and the facts and circumstances of this case, and any other just and appropriate relief.

35

## COUNT II

### VICARIOUS LIABILITY FOR VIOLATIONS OF M.G.L. c. 137, § 1.

### (VGW HOLDINGS LIMITED)

134. Plaintiff incorporates the foregoing allegations of paragraphs 1-133 as if fully set forth herein and sues VGW HOLDINGS LIMITED as set forth below.

135. Plaintiff alleges that VGW HOLDINGS LIMITED is vicariously liable for any and all actions by VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW US, INC. relating to these allegations. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968).

136. To attribute the actions of VGW Malta or VGW Luckyland to VGW Holdings, this Court must make a "determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose, based on evaluative consideration of twelve factors[.]" Attorney Gen. v M.C.K., Inc., supra at 555 n.19, citing Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 15-16 (1st Cir. 1985) (categorizing My Bread Baking Co. factors).

137. VGW HOLDINGS LIMITED has pervasive control over the Subsidiaries as outlined in the allegations herein and uses those Subsidiaries for an improper purpose.

138. As such, VGW HOLDINGS LIMITED is liable for the actions of the other Defendants regardless of whether VGW Holdings is independently liable under Count I.

WHEREFORE, Plaintiff seeks judgment against Defendants for all damages or losses, treble damages or losses, interest, costs, and attorney's fees that Plaintiff is entitled to by law and the facts and circumstances of this case, and other just and appropriate relief.

36

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of any and all issues in this action so triable by

Massachusetts law.

DATED: October 30, 2023

Respectfully submitted,

FAIR GAMING ADVOCATES MA LLC

By its attorney

**/s/ Quinn Heath**
_____

Quinn Heath, Esq.
476 Windsor Street #1
Cambridge, MA 02141
Board of Bar Overseers No.: 709258
Telephone: (617) 468-8343
Email: quinn@cfsattorneys.com

*Attorney for Plaintiff*

| | | | |
|---|---|---|---|
| **DOCKET NUMBER** | | **Trial Court of Massachusetts** **2** | |
| **CIVIL ACTION COVER SHEET** | | **The Superior Court** | |
| **PO** | | **COUNTY** | |

| Plaintiff | FAIR GAMING ADVOCATES MA LLC | Defendant | VGW HOLDINGS LIMITED |
|---|---|---|---|
| ADDRESS: | 82 Wendell Ave. | ADDRESS: | 'Australia Place' Level 11 |
| Suite 100 | | 15-17 William Street | |
| Pittsfield, MA 01201 USA | | Perth, WA 6000 Australia | |
| Plaintiff Attorney: | Quinn Heath, Esq. | Defendant: | VGW MALTA LIMITED |
| ADDRESS: | 476 Windsor St. | ADDRESS: | Trident Park, Notabile Gardens No6 - Level 3 |
| Apt. 1 | | Central Business District Mdina Road, Zone 2 | |
| Cambridge, MA 02141 USA | | BIRKIRKARA CBD2010, Malta | |
| BBO: | 709258 | | |
| Plaintiff: | | Defendant: | VGW LUCKYLAND INC. |
| ADDRESS: | | ADDRESS: | 2140 S DUPONT HWY |
| | | Camden, DE 19934 USA | |
| | | | |
| Plaintiff: | | Defendant: | VGW US, INC. |
| ADDRESS: | | ADDRESS: | 2140 S DUPONT HWY |
| | | Camden, DE 19934 USA | |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | M.G.L. 137 § 1 (recovery of gaming losses) | F | ☒ YES ☐ NO |

**\*If "Other" please describe:** _____

| Is there a claim under G.L. c. 93A? | Is there a class action under Mass. R. Civ. P. 23? |
|---|---|
| ☐ YES  ☒ NO | ☐ YES  ☒ NO |

### STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date

| | |
|---|---|
| 1. Total hospital expenses | $0.00 |
| 2. Total doctor expenses | $0.00 |
| 3. Total chiropractic expenses | $0.00 |
| 4. Total physical therapy expenses | $0.00 |
| 5. Total other expenses (describe below) | $0.00 |
| | |
| Subtotal (1-5): | $0.00 |
| B. Documented lost wages and compensation to date | $0.00 |
| C. Documented property damages to date | $0.00 |
| D. Reasonably anticipated future medical and hospital expenses | $0.00 |
| E. Reasonably anticipated lost wages | $0.00 |
| F. Other documented items of damages (describe below) | $50,001.00 |

Anticipated M.G.L. c. 137 § 1 losses exceeding $50,000.

| | |
|---|---|
| TOTAL (A-F): | $50,001.00 |

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

Plaintiff is an "any other person" permitted to sue in tort pursuant to M.G.L. c. 137 § 1 for damages sustained by third parties to unlicensed "gaming" as defined by M.G.L. c. 137 § 1. Damages are anticipated and alleged to exceed $50,000.

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

| Signature of Attorney/Self-Represented Plaintiff: X  /s/ Quinn Heath | Date: | October 30, 2023 |
|---|---|---|

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION UNDER S.J.C. RULE 1:18(5)

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney: X  /s/ Quinn Heath | Date: | October 30, 2023 |
|---|---|---|

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

### AC Actions Involving the State/Municipality†*

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

\* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

†* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

### PA Civil Actions Involving Incarcerated Party ‡

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

### RP Summary Process (Real Property)

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/ Non-residential (F)

### RP Real Property

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E(X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (A)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (X)
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (X)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S(X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

---

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**
**IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND ACCURATELY, THE CASE MAY BE DISMISSED.**