

**SUFFOLK COUNTY CIVIL**
**Docket Report**

---

### 2384CV02451 Fair Gaming Advocates MA Llc vs. Vgw Holdings Limited et al

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/30/2023 |
| **ACTION CODE:** B99 | | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** Other Tortious Action | | | |
| **CASE DISPOSITION DATE:** 11/30/2023 | | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 11/30/2023 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil H |

| PARTIES |
|---|

| | |
|---|---|
| **Plaintiff**<br>Fair Gaming Advocates MA Llc<br>82 Wendell Ave.<br>Suite 100<br>Pittsfield, MA 01201 | **Attorney**                                                709258<br>Quinn R Heath<br>The Mensing Group LLC<br>The Mensing Group LLC<br>100 State St<br>9th Floor<br>Boston, MA 02109<br>Work Phone (617) 468-8343<br>Added Date: 10/29/2023 |
| **Defendant**<br>Vgw Holdings Limited<br>Out Of Country<br>N/A, MA 00000 | **Attorney**                                                693698<br>Matthew D LaBrie<br>Orrick, Herrington and Sutcliffe LLP<br>Orrick, Herrington and Sutcliffe LLP<br>222 Berkeley St<br>Suite 2000<br>Boston, MA 02116<br>Work Phone (617) 880-2208<br>Added Date: 11/30/2023 |
| **Defendant**<br>Vgw Luckyland Inc.<br>2140 S Dupont Hwy<br>Camden, DE 19934 | **Attorney**                                                693698<br>Matthew D LaBrie<br>Orrick, Herrington and Sutcliffe LLP<br>Orrick, Herrington and Sutcliffe LLP<br>222 Berkeley St<br>Suite 2000<br>Boston, MA 02116<br>Work Phone (617) 880-2208<br>Added Date: 11/30/2023 |
| **Defendant**<br>Vgw Malta Limited<br>Out Of Country<br>N/A, MA 00000 | **Attorney**                                                693698<br>Matthew D LaBrie<br>Orrick, Herrington and Sutcliffe LLP<br>Orrick, Herrington and Sutcliffe LLP<br>222 Berkeley St<br>Suite 2000<br>Boston, MA 02116<br>Work Phone (617) 880-2208<br>Added Date: 11/30/2023 |



**SUFFOLK COUNTY CIVIL**
**Docket Report**

| Defendant | Attorney | 693698 |
|---|---|---|
| Vgw Us, Inc.<br>2140 S Dupont Hwy<br>Camden, DE 19934 | Matthew D LaBrie<br>Orrick, Herrington and Sutcliffe LLP<br>Orrick, Herrington and Sutcliffe LLP<br>222 Berkeley St<br>Suite 2000<br>Boston, MA 02116<br>Work Phone (617) 880-2208<br>Added Date: 11/30/2023 | |

## FINANCIAL DETAILS

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/30/2023 | Civil Filing Fee (per Plaintiff) Receipt: 41372 Date: 10/30/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/30/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 41372 Date: 10/30/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/30/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 41372 Date: 10/30/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| | **Total** | **275.00** | **275.00** | **0.00** | **0.00** |

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 10/30/2023 | 1 | Complaint electronically filed. | |
| 10/30/2023 | 2 | Civil action cover sheet filed. | |
| 10/30/2023 | | Case assigned to:<br>DCM Track F - Fast Track was added on 10/30/2023 | |
| 10/30/2023 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Quinn R Heath, Esq. quinn@mensinggroup.com | |
| 11/28/2023 | 3 | Defendants Vgw Holdings Limited, Vgw Malta Limited, Vgw Luckyland Inc., Vgw Us, Inc.'s Notice of Removal<br><br>(U.S District #23cv-12878) | |
| 11/30/2023 | | REMOVED to the U.S. District Court Of Massachusetts | |
| 11/30/2023 | | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON
November 30, 2023, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

| PO **CIVIL ACTION COVER SHEET** | DOCKET NUMBER<br><br>23 - 2451 H | **Trial Court of Massachusetts**<br>**The Superior Court** | 2 |
|---|---|---|---|
| | | **COUNTY** | |

| | | | |
|---|---|---|---|
| **Plaintiff** | FAIR GAMING ADVOCATES MA LLC | **Defendant:** | VGW HOLDINGS LIMITED |
| **ADDRESS:** | 82 Wendell Ave. | **ADDRESS:** | 'Australia Place' Level 11 |
| Suite 100 | | 15-17 William Street | |
| Pittsfield, MA 01201 USA | | Perth, WA 6000 Australia | |
| **Plaintiff Attorney:** | Quinn Heath, Esq. | **Defendant:** | VGW MALTA LIMITED |
| **ADDRESS:** | 476 Windsor St. | **ADDRESS:** | Trident Park, Notable Gardens No6 - Level 3 |
| Apt. 1 | | Central Business District Mdina Road, Zone 2 | |
| Cambridge, MA 02141 USA | | BIRKIRKARA CBD2010, Malta | |
| BBO: | 709258 | | |
| **Plaintiff:** | | **Defendant:** | VGW LUCKYLAND INC. |
| **ADDRESS:** | | **ADDRESS:** | 2140 S DUPONT HWY |
| | | Camden, DE 19934 USA | |
| **Plaintiff:** | | **Defendant:** | VGW US, INC. |
| **ADDRESS:** | | **ADDRESS:** | 2140 S DUPONT HWY |
| | | Camden, DE 19934 USA | |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | M.G.L. 137 § 1 (recovery of gaming losses) | F | ☒ YES   ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?          Is there a class action under Mass. R. Civ. P. 23?
☐ YES   ☒ NO                                            ☐ YES   ☒ NO

**STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date

| | |
|---|---|
| 1. Total hospital expenses | $0.00 |
| 2. Total doctor expenses | $0.00 |
| 3. Total chiropractic expenses | $0.00 |
| 4. Total physical therapy expenses | $0.00 |
| 5. Total other expenses (describe below) | $0.00 |
| | |
| Subtotal (1-5): | $0.00 |
| B. Documented lost wages and compensation to date | $0.00 |
| C. Documented property damages to date | $0.00 |
| D. Reasonably anticipated future medical and hospital expenses | $0.00 |
| E. Reasonably anticipated lost wages | $0.00 |
| F. Other documented items of damages (describe below) | $50,001.00 |
| Anticipated M.G.L. c. 137 § 1 losses exceeding $50,000. | |
| TOTAL (A-F): | $50,001.00 |

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

Plaintiff is an "any other person" permitted to sue in tort pursuant to M.G.L. c. 137 § 1 for damages sustained by third parties to unlicensed "gaming" as defined by M.G.L. c. 137 § 1. Damages are anticipated and alleged to exceed $50,000.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

SC0001: 1/13/2023                        www.mass.gov/courts                        Date/Time Printed:10-20-2023 20:17:25

PO

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| FAIR GAMING ADVOCATES MA LLC, | |
| *Plaintiff,* | |
| vs. | Civil Action No.: 23-2451 H |
| VGW HOLDINGS LIMITED, | |
| VGW MALTA LIMITED, | |
| VGW LUCKYLAND INC., and | |
| VGW US, INC. | |
| *Defendants.* | |

## COMPLAINT

Plaintiff FAIR GAMING ADVOCATES MA LLC brings this action on behalf of itself

as permitted by Chapter 137, § 1 of the Massachusetts General Laws (hereinafter "M.G.L. c.

137, § 1") against Defendants VGW HOLDINGS LIMITED, an Australian company; VGW

MALTA LIMITED, a Maltese company; VGW LUCKYLAND INC., a Delaware corporation;

and VGW US, INC., a Delaware corporation (collectively, "Defendants").

## BACKGROUND

1.  Defendants own and operate what they claim are video game development businesses and

    cashless "social casino[s]." In reality, Defendants have created, own, and operate popular

    unlicensed virtual casinos, including real virtual casino games offered under the names

    "Chumba Casino" ("Chumba") and "Luckyland Slots" ("Luckyland").

2.  "Luckyland Slots" games are reportedly owned and operated by VGW LUCKYLAND

    INC., VGW US, INC., and affiliates (the "Luckyland Defendants"); while "Chumba

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

Casino" games are reportedly owned and operated by VGW MALTA LIMITED and affiliates (the "Chumba Defendant"). However, VGW LUCKYLAND INC., VGW US, INC., and VGW MALTA LIMITED each are <u>wholly</u> owned and controlled by VGW HOLDINGS LIMITED.

3. VGW HOLDINGS LIMITED, in turn, is an Australian company reporting annual revenues in the <u>billions</u> (of Australian dollars) which is owned and controlled primarily by a single individual Laurence Escalante who holds a majority equity interest of over 60% in VGW HOLDINGS LIMITED.

4. Defendants have represented to the public and to various financial institutions, such as banks and credit card processing companies, that Defendants operate video game or arcade websites permitting "just for fun" gameplay. However, Defendants intentionally operate websites that are actually unlicensed internet gambling casinos where customers and consumers <u>wager</u> and <u>lose</u> real money on slot machines from the comfort of their Massachusetts residences. Defendants thinly veil this unlicensed (and illegal) gambling operation by characterizing components of their offerings as "sweepstakes."

5. Initially, in exchange for "real money" from consumers, Defendants sell virtual currency, dubbed "coins", that can be used to wager on games of chance for fun. However, Defendants have established a scheme to deprive consumers of money by enticing consumers with the potential to win "real money" prizes. Defendants use the "coins" concept to entice Massachusetts consumers while hiding that Defendants are engaging in real money gambling, all while misleading regulators and Massachusetts residents about the true nature of Defendants' business.

6.  This has been the *modus operandi* of Defendants for over a decade. As early as 2012, the billionaire founder, CEO, and controlling shareholder of Defendants Laurence Escalante expressed his intent to create virtual gambling casinos that would offer United States consumers the opportunity to gamble online with "virtual currency" at a time when "real money" gambling could only be offered to those consumers outside of the United States. Mr. Escalante and Defendants have held and publicized this business plan and their goal to combine "virtual currency and gambling" from 2012 through the present. See, e.g., a video presentation of this publicized intent at https://www.youtube.com/watch?v=M-ckhp92V-0&list=PPSV.

7.  For at least the last several years, Defendants have marketed and operated an online "real money" gambling casino within Massachusetts, a large market known for having extensive restrictions on gambling.

8.  In Massachusetts, as in other states, Defendants target and entice visitors and consumers to play on their sites by offering a "free-to-play" option where players receive a bundle of free "Gold Coins" to play their casino games—on a website or app where every game is a game of chance. After Massachusetts consumers inevitably lose these free coins, they are prompted to purchase more if they wish to continue playing.

9.  After Massachusetts consumers have paid for additional "Gold Coins", they continue to wager to win more "Gold Coins". The "coins" won by paying consumers playing Defendants' game of chance are identical to the "coins" Defendants sell. Therefore, by wagering "coins" that were purchased consumers have the chance to win additional coins that they would otherwise have had to purchase to utilize Defendants site.

3

10. "Gold Coins" cannot be redeemed by consumers for "real money." However through the process described in paragraphs 8 and 9, Defendants introduce the Massachusetts consumer to their site and the consumer expends money to play casino games of chance for the experience of the game. The exclusive purpose of selling consumers the "Gold Coins" is to cause consumers to play the Defendants' games of chance. It is very difficult for consumers to play Defendants' games without purchasing "Gold Coins" and impossible to play any of the games without maintaining a balance of coins for wager.

11. Defendants simultaneously offer "real money" gambling to Massachusetts residents on the same websites as the "Gold Coin" gambling, using a separate virtual currency titled "Sweeps Coins." By purchasing "Sweeps Coins", Massachusetts residents can convert their experience on Defendants' sites into a more traditional gambling model where the consumer wins (or more often, loses) "real money."

12. By calling these coins "Sweeps Coins" and this gambling process a "sweepstakes", Defendants improperly attempt to evade the direct ire of law enforcement in other, non-Massachusetts states where unlicensed online gambling is illegal but online "sweepstakes" arc allowable.

13. This online casino scheme has been wildly profitable for Defendants as a whole. According to finance statements provided to its shareholders and Australian security regulators in the year ended June 30, 2023, VGW HOLDINGS LIMITED (reporting consolidated revenues on behalf of all subsidiaries) reported approximately $4,835.1 million (AUD) in revenue and spent $360.0 million on marketing alone. That same year, VGW Holdings reported "promotional sweepstakes prizes" of $3,355.5 million.

4

14. It is impossible to know precisely how much Massachusetts consumers have lost to Defendants, as Defendants consolidate their audited financial statements globally and neglect to include any geographic breakdowns on said statements.

15. However, Defendants actively advertise to and engage with hundreds, thousands, or more Massachusetts consumers.

## JURISDICTION AND VENUE

16. The courts of Massachusetts have personal jurisdiction over Defendants pursuant to M.G.L. c. 223A, § 3 because this claim arises from Defendant's transaction of business in this Commonwealth, arises from the supplying of services by Defendant in this Commonwealth, and alleges a tortious injury caused by an act outside of the Commonwealth by Defendants who regularly solicit and do business and engage in persistent course of marketing and derive substantial revenue from services rendered in this Commonwealth.

17. This Court has jurisdiction over the subject matter of this action pursuant to M.G.L. c. 212, § 3, because it is a court of general jurisdiction and the damages sought by Plaintiff far exceed $50,000.

18. Venue is proper in this county pursuant to the Massachusetts General Laws because a substantial part of the events giving rise to the claims asserted herein occurred in this county, because Defendants committed acts that are the bases of this lawsuit in this county, and because no party "lives in" the Commonwealth as that phrase is used in M.G.L. c. 223, § 1.

## PARTIES

5

19. Plaintiff is an "any other person", who in accordance with M.G.L. c. 137, § 1 "Recovery of money or goods lost at gaming; limitations", "…may sue for and recover in tort treble the value thereof" the losses suffered by Massachusetts residents to unlicensed "cards, dice, or other game, or by betting on the sides or hands of those gaming…or…pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet[.]"

20. VGW HOLDINGS LIMITED ("VGW Holdings") owns and operates internet gambling websites and apps that are available to and utilized by residents of Massachusetts and owns and operates subsidiary entities that in turn also own and operate such internet gambling websites and apps.

21. VGW Holdings is an Australian "Public Company" not listed for public trading and which is majority owned (over 60% ownership and voting control) by Mr. Laurence Escalante. Mr. Laurence Escalante is a Director of VGW HOLDINGS LIMITED.

22. On information and belief, VGW Holdings maintains offices in Perth, Australia.

23. VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW US, INC. each jointly and independently own and operate internet gambling websites and apps that are available to and utilized by residents of Massachusetts. These three entities are each 100% owned and controlled by VGW Holdings.

24. Mr. Laurence Escalante is also a Director and/or Manager of VGW MALTA LIMITED, and on information and belief a Director or Manager of VGW LUCKYLAND INC., and VGW US, INC.

6

25. VGW MALTA LIMITED ("VGW Malta") is a Malta Limited Liability Company which is 100% owned and controlled by VGW Holdings.

26. On information and belief, VGW Malta does not have an office.

27. VGW LUCKYLAND INC. ("VGW Luckyland") owns and operates an office at 442 Post. St., Floor 9, in San Fransisco, California and is incorporated in the state of Delaware. VGW Luckyland is 100% owned and controlled by VGW Holdings.

28. VGW US, INC. ("VGW US") is a Delaware corporation which is 100% owned and controlled by VGW Holdings.

29. VGW Holdings, VGW Malta, VGW Luckyland, and VGW US each conduct business throughout this county, the Commonwealth of Massachusetts, and the United States of America.

30. VGW Holdings, VGW Malta, VGW Luckyland, and VGW US each have customers from this county, the Commonwealth of Massachusetts, and throughout the United States of America, and regularly solicit business and consumers by marketing throughout the same.

## FACTUAL ALLEGATIONS

### I.    Free-to-Play, the New Era of Online Gambling and the Defendants

31. Defendants utilize a so-called "free-to-play" business model with the goal of manipulating consumers and enticing them to spend real money on familiar casino games of chance-based hope.

32. "Free-to-play" video games have experienced immense growth thanks to the proliferation of Internet-connected mobile devices. Free-to-play game developers do not expect to produce products without a revenue stream—rather the consumer can download and

(initially) play games for free but is later enticed to purchase low-cost virtual items from within the game itself. Games using this model generally charge prices for content as low as $0.99 (often dubbed "microtransactions") instead of charging an up-front fee, and developers make profits by selling thousands of low-cost virtual items.

33. The free-to-play model is a proven method whereby developers can generate huge profits. This business model has become attractive to the developers of games of chance in particular, who offer games such as online automated blackjack or slot machine mobile video games.

34. Defendants and other developers of games of chance quickly became aware of how these business models could be adapted and used to exploit the same psychological triggers used by brick-and-mortar casinos. As reported by one respected video game publication:

> If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item.

PC Gamer, Microtransactions: the good, the bad and the ugly,

http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Oct. 15, 2023).

35. Another respected video game magazine reported in 2023 on the rise and danger of such use of "microtransactions", free-to-play business models, and the implementation of casino-style gambling using "microtransactions":

8

> [M]any new mobile and social titles target small, susceptible populations for large percentages of the revenues. If ninety-five people all play a [free to play] games without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling.

Game Informer, How Microtransactions Are Bad For Gaming – Features,

https://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-

are-bad-for-gaming.aspx (last visited Oct. 19, 2023).

36. Academics have studied the socioeconomic effect that free-to-play games have on

consumers. In one study, authors evaluating several sources analyzing "free-to-play"

"casino games" of chance concluded that these virtual gambling sites can have a similar

deleterious effect on consumers and lead to treatment for real-life gambling disorders:

> [Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (e.g., employment, education, income) with online gamblers. Given these similarities it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling.
> […]
> According to [another study] the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1-5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60% of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits.

9

Hyoun S. Kim, Michael J. A. Wohl, et al., Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors, Journal of Gambling Studies (co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming) (Nov. 14, 2014), available at http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (last visited April 5, 2023).

37. The same authors looked at the link between playing free-to-play games of chance and gambling casinos. They stated that "prior research indicated that winning large sums of virtual credits on social gaming sites was a key reason for [consumers] migration to online gambling[.]" The largest prediction that a consumer will transition to online gambling was "microtransaction engagement" according to these authors. They found that "the odds of migration to online gambling were approximately eight times greater among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."

38. Defendants exploit these well-established consumer tendencies to manipulate Massachusetts consumers to transition from playing their introductory "free-to-play" game into spending real dollars on virtual "coins" used to veil real money gambling.

## II.    Defendants' Games

39. Defendants operate two popular casino-oriented Internet game brands and websites. These brands and offerings are "Chumba Casino" reportedly operated by the Chumba Defendant; and "Luckyland Slots" operated by the Luckyland Defendants.

40. Both Chumba Casino and Luckyland Slots are operated in a substantially similar way, and each brand operated by a collaboration including some or all Defendants. Therefore

10

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

the allegations in this Complaint are alleged to have occurred on each and every

"Chumba Casino" or "Luckyland Slots" brand, website, or game regardless of which

Defendant(s) operated individual games or websites (collectively referred to as "games"

or "Defendants' games").

41. When consumers visit Defendants' websites and games, consumers are awarded an initial

allocation of "free" coins. Consumers are offered two different types of coins on

Defendants' sites: "Gold Coins" (hereinafter referred to as "GC") and "Sweeps Coins"

(hereinafter referred to as "SC", or collectively, the "coins").

42. Massachusetts consumers also receive one or both types of coins as a free daily bonus

once-a-day when logging on to their accounts. An example of the popup message for this

"Daily Bonus" is below:

11



43. Consumers can play games on the platform in "standard mode" or "standard play" using

GC or play in "promotional mode" or "promotional play" using SC. Consumers may

12

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

switch between these two modes as easily and frequently as they like. An example of the toggle button permitting this switching is shown below:



44. It is only possible to play Defendants' games through the wagering of either GC or SC. It is impossible for a consumer to play Defendants' games when the consumer does not have a balance of coins in an account with Defendants.

45. When consumers play in "standard mode" or "standard play" they can win or lose GC. Routinely after they begin playing, consumers quickly lose their allotments of GC. This is because the consumer is playing games of chance which are skewed heavily in favor of Defendants—just like in a brick-and-mortar casino. The longer a consumer plays Defendants' games the more likely Defendants will ultimately win and the consumer will exhaust his or her coins.

46. Immediately after the GC are exhausted, when consumers attempt to continue playing Defendants inform consumers that they have insufficient coins to place a wager, preventing them from continuing to play the current game. On Chumba Casino users are presented with the message below instructing them to purchase more GC to keep playing:

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number



47. Upon clicking "Buy Gold Coins" on Chumba Casino consumers are redirected to the "Store" where they can purchase more GC. Most purchase options presented to the Massachusetts consumer are offered as a package including SC with the purchase of GC. Unlike GC, the SC are prominently highlighted by the Defendants in green on both Chumba Casino and Luckyland Slots (a color commonly associated with money). An example of the Chumba Casino Store is shown below:



48. When users on Luckyland Slots are out of GC, they are shown a purchase screen where every package includes SC. On this screen depicted below, SC are similarly referred to in green text:

15

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number



49. The same process occurs for consumers playing for real money in "promotional play" or "promotional mode." After attempting to play a game with insufficient SC in their account the consumer is redirected to the Store to purchase more GC and SC. The consumer is shown the same messages depicted in the paragraphs above and is effectively instructed that the purchase of a package including GC and SC is required to continue playing.

50. Regardless of which mode the consumer is using ("promotional play" or "standard play"), the Massachusetts consumer must purchase additional coins if the consumer wishes to continue playing. Consumers are presented with options to purchase additional GC and purchase packages and prices can vary. For example, Chumba generally offers packages in ranges from $1.00 for 200,000 GC to $1,000 for 400,000,000 GC. SC provided with each package generally tracks the amount of "real money" spent on GC. For example, a $10.00 purchase of 40,000 GC typically includes the purchase of 10 SC

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

coins. "Bonus" SC are often provided with larger purchase amounts to entice consumers to make larger purchases.

51. Consumers can resume playing Defendants' games with new GC and SC. If the consumer wins GC, the consumer can use GC to continue playing games "for fun." Inevitably, consumers eventually lose their entire GC balance and must spend more money to continue playing the games "for fun." However, Defendants far more heavily advertise and promote the ability of consumers to receive SC or real money and the ability of the consumers to receive SC for their purchase.

52. For example, Defendants regularly show video advertisements on Facebook to Massachusetts consumers where "winners" of Defendants' games display comically-sized cash checks and discuss their prizes. A still from one such video advertisement displayed to Massachusetts consumers browsing Facebook in October 2023 is depicted below:

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number



18

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

53. The process is the same for playing with Sweeps Coins (SC) as well. The only, critical difference being that Sweeps Coins <u>can be redeemed for cash or real money with an exchange rate of one SC to one dollar</u>.

54. This offering of a conversion back to U.S. dollars ups the stakes for consumers and is the mechanism through which Defendants' games use the allure of "free-to-play" initial offerings to manipulate Massachusetts consumers into spending, gambling, and losing <u>real</u> money.

55. Defendants, from time-to-time, offer free coins to entice consumers to play Defendants' casino games. Defendants prey on well-known consumer tendencies towards scientifically recognized gambling addiction. Consumers inevitably lose the free coins provided to them, which stimulates many consumers to purchase more coins necessary to play by redirecting those users to the game's Store. Both "standard play" and "promotional play" modes using GC or SC utilize such tactics.

56. Defendants' games in their Terms of Service agreements claim erroneously that GC have "no monetary value". However this position clashes with Defendants' own financial statements to shareholders which claim "player purchases of gold coins are recognized over time as revenue based on the player retention period and amortized accordingly." GC have independent value to the consumer as they require GC to play additional games of chance. While other popular games offer purchases simply to enhance the video game experience, purchasing coins from Defendants' games is an effective price-of-admission to enjoying Defendants' offerings.

19

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

57. In addition to the same system described in the previous paragraph and as further described in paragraphs 103-104, SC purchases are recognized as a partial liability on the financial statements of VGW Holdings, as "a liability for cashable sweepstakes."

58. The equivalency of using GC to real money gambling is made clearer with a hypothetical. If a consumer spends $20.00 on 5,000,000 GC, that effectively values GC at approximately 100,000 per $0.40. If the consumer wagers 100,000 GC on a pull of a slot machine or spin of a digital roulette wheel, that consumer may be lucky and win 500,000 GC, which the consumer can use to continue playing in lieu of making an additional GC purchase. In other words, absent this win the 500,000 GC would have cost the consumer an additional $2.00 to purchase. When consumers wager GC they are exclusively wagering to win more GC to continue playing—and win money in the form of avoiding a future purchase of GC. Consequently, even the wagering of GC alone is still unlicensed gambling.

59. Moreover, with the gambling of SC in promotional mode it is extremely clear that victims are directly gambling with real money. Gambling of SC is where Defendants make the lion's share of their profits through exploitation of Massachusetts consumers.

60. The Chumba Defendant claims on Chumba Defendant's websites that "Sweeps coins cannot be purchased and [have] no inherent value." https://www.chumbacasino.com/about-us. However, this is flatly disingenuous as the GC purchase packages (depicted in this Complaint) prominently display the amount of SC the consumer receives, and the SC can be redeemed directly to consumers' bank accounts where 1 SC is equal to 1 U.S. dollar. It is no coincidence that at the time of purchase of GC, the amount of SC made available to the consumer is nearly 1-to-1 for the number of

20

dollars spent by the Massachusetts consumer. When a consumer plays SC and has a balance the redemption button is prominently displayed on Defendants' games—clearly identifying that the consumer can redeem the SC for cash (or cash-equivalent gift cards). Below are images of said process on Chumba Casino:



Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number



Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

61. Defendants incentivize consumers to continue playing their games, and eventually lose their SC balance by making it difficult for consumers to collect and redeem SC. The minimum permitted redemption amount on Chumba Casino is 100 SC to be redeemed for $100 and on Luckyland Slots is 50 SC to be redeemed for $50. Any balance a consumer has below 100 SC remains "stuck" on the site, a sunk cost encouraging consumers to continue playing Defendants' games. Defendants also only permit one redemption at a time and implement timing delays by adding unnecessary extra steps to separately "approve" and "process" redemptions. These restrictions are designed to further entice consumers to cancel their requests to redeem SC and continue playing Defendants' games. Such techniques or restrictions are not permitted at brick-and-mortar casinos which face regulation by the Commonwealth and must adhere to Code of Regulations chapters that do not reach Defendants' unlicensed games of chance.

62. Defendants use the "free-to-play" business model to entice consumers to play games of chance which are indistinguishable from brick-and-mortar casino games, which are themselves equipped with digital video type gambling machines, ranging in games from blackjack and roulette to slots. Defendants stimulate consumers and entice them to purchase GC after running out of their initial free GC. At that time, Defendants display and highlight (in green, depicted above) the SC that the consumer receives in the purchase package. The consumer is made aware through the site and Defendants' advertising that SC values are equivalent to real money, cementing this casino experience that does not require the Massachusetts consumer to travel to one of the state's three licensed, brick-and-mortar casinos.

63. Massachusetts consumers may accumulate Seeps Coins (SC) in one of several ways:

23

a.  By receiving SC upon the purchase of marked packs of Gold Coins (GC);

b.  By entering occasional "Sweeps Coins no-cost give away contests" on the games' Facebook pages;

c.  By sending a request by mail to an address published by Defendants (in exchange for five SC, or approximately $5.00 worth of SC per request); or,

d.  As a "Daily Bonus" given when logging on to the players account (once per day, in a small amount). See *https://www.chumbacasino.com/sweeps-rules*.

Consumers are highly incentivized to choose option "a", because the other options are less advertised, difficult or slow (taking months to write, send, and receive credits for sending mail requests), or offer truly nominal incentives compared to a purchase (receiving 1 SC/$1.00 per day from the "Daily Bonus" feature).

64. Defendants often arbitrarily reject submissions of mailed requests for SC, contrary to their published rules.

65. On or around September 20, 2023, the Chumba Defendant altered its contractual "Sweepstakes Rules" to make it easier for the Chumba Defendant to refuse mailed requests that take more than 90 days to process or where mailed requests are sent using "handmade envelopes that are not suitable for machine processing". On information and belief, the Luckyland Defendants implemented similar changes to their contractual terms.

66. Players can play the same casino games using SC that they would play with GC. The significant and only difference is that when a consumer plays Defendants' games with GC, a consumer or player can only win or lose GC (whose value exists in allowing consumers to play games without paying additional money), while SC can be redeemed for dollars in the Massachusetts consumer's bank account.

24

67. Purchases of SC are usually provided by Defendants at a rate slightly above a 1:1 conversion rate. Consumers who purchase more SC at once receive a more favorable exchange rate. A consumer who purchases $5.00 of GC and SC may receive 5.05 SC; where a consumer who purchases $300.00 would receive 315 SC (a difference conversion rate benefitting the consumer making a larger purchase by 5%). This is another tactic utilized by brick-and-mortar casinos—in the form of extra chips and free play, or comped drinks, food, and lodging provided to incentivize players to gamble more and lose more money.

68. Massachusetts consumers are forbidden from immediately redeeming any SC without first using that SC in a wager. Defendants claim that because SC are unable to be redeemed before wagering that they have no "value" and this somehow converts their illegal gambling operation into a "sweepstakes" which can operate legally. In other words, consumers are required to play games of chance and gamble on Defendants' games with SC in order to later redeem any SC and collect a (money) prize. See _https://www.chumbacasino.com/sweeps-rules_.

69. Accumulation of SC by players may provide an incentive for them to purchase GC or SC from Defendants. However, winning any actual money by accumulating Sweeps Coins (SC) through gambling is unrealistic for most players. As these games of chance do not adhere to applicable state law and regulation and these international Defendants evade enforcement, these games may more heavily favor the Defendants than even a brick-and-mortar casino offering the same games.

70. The vast majority of Defendants' games are in the style of a virtual slot machine. Regardless of what type of coins a consumer wagers (SC or GC), once the consumer

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

"spins" the slot machine by pressing a button on Defendants' slot machine games, none of Defendants' slot machine games allow or call for additional user input. Instead, the consumer's device communicates and sends information to Defendants' servers. Defendants' servers execute the games' algorithms to determine the spin's outcome and report that result back to the consumer's device in Massachusetts.

71. None of the outcomes in Defendants' slot machine games depend on <u>any</u> amount of skill to determine their outcomes, as all outcomes are based entirely on chance.

72. Chumba Casino offers blackjack-style games in which the player makes choices and wagers coins (SC or GC) in a manner nearly identical to placing bets at a traditional blackjack table. The chances of winning are not known or knowable to the consumer as the algorithms employed by Defendants are not public.

73. Defendants maintain win and loss records and account balances for each consumer account.

74. Once Defendants' game algorithm determines the outcome of a wager, Defendants display the outcome to the consumer and adjust the consumer's account balance.

75. Defendants keep records of each wager, outcome, win, and the losses for each and every player and account on Defendants' games.

76. Massachusetts consumers <u>cannot</u> obtain SC through the gambling of GC (and can only obtain SC as described in paragraph 63).

77. Often Consumers will purchase additional packages of GC and SC despite having a large balance of GC remaining. This is because consumers are encouraged by Defendants' business model to focus on wagering SC so they might win "real money" in the form of more SC currency.

26

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

78. Defendants use the name "Sweeps Coins" in reference to sweepstakes prizes in an attempt to avoid legal enforcement. In reality, Defendants' games require the purchase of SC using money in order to receive a chance at winning real money. Other methods of obtaining SC result in an award of only nominal amounts of SC for the effort expended by the consumer. In other words, the purchase and redemption of "Sweeps Coins" functions equivalent to "chips" in a brick-and-mortar casino.

79. Contrary to Massachusetts law, Defendants are operating unlicensed, virtual casinos within the Commonwealth of Massachusetts, and Defendants have misrepresented to Massachusetts consumers that the consumers are participating in games that are permitted by Massachusetts law.

80. In reality, Massachusetts consumers are actually gambling or engaging in other prohibited wagered gaming as defined by Massachusetts law.

### III.   Defendant's Targeted Enticement of United States and Massachusetts Consumers

81. Marketing materials for all Defendants' games consistently target Massachusetts residents specifically using advertising that is geographically limited in scope to exclude non-United States residents.

82. Google's Public "Ad Transparency Center" (https://adstransparency.google.com/?region=US) reports that VGW Luckyland and VGW US have each placed hundreds of video, text, and image ads throughout the United States, on behalf of both the Chumba Casino and Luckyland Slots brands. The Ad Transparency Center states that each "[a]dvertiser has verified their identity" with documentary evidence. Limiting ads of Defendants' on Google's Ad Transparency

27

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

Center to those displayed only in the United States by VGW Luckyland and VGW US lists hundreds of ads.

83. Online advertising tools such as Google Ads would allow for Defendants to exclude Massachusetts residents from seeing Defendants' ads easily, but Defendants do not utilize any such exclusions.

84. Defendants have placed hundreds of ads displayed to United States and Massachusetts residents using Google's online advertising services.

85. Defendants and Defendants' games also actively use social media to advertise to Massachusetts consumers.

86. For example, Massachusetts residents using the popular social media app Facebook are served video and image advertisements while using the Facebook site.

87. Facebook also allows advertisers to limit their advertisements geographically, but Defendants choose to serve advertisements for illegal gambling to residents of the Commonwealth on Facebook.

88. Defendants' advertisements often include themes such as: describing individuals who have won real money on Defendants' games (often holding a comically-sized check as depicted in paragraph 52), showing games of chance such as a slot machine being played, or engaging with United States-based social media "influencers" with great reach.

89. Finally, Defendants often partner with United States-based "influencers" or internet celebrities in order to further entice Massachusetts residents to engage with Defendants' games.

90. For example, Defendants publish a game called "Brian Christopher Slots" which depicts and is marketed in collaboration with the eponymous Brian Christopher. Brian

28

Christopher is an online personality indicated in Luckyland's own marketing materials to reside in "Palm Springs, California." <u>See</u> https://www.bcslots.com/about.html, https://www.bcslots.com/playbcslots.html.

91. Defendants advertise and target Massachusetts residents to participate in their unlicensed gaming through direct marketing on a variety of platforms and media.

**IV.** **VGW Holdings Limited's Absolute Control Over the Chumba Defendant and Luckyland Defendants, and Mr. Laurence Escalante's Direct Control Over All Defendants.**

92. The directors and officers of VGW Holdings Limited, as of 2022, are: LAURENCE ESCALANTE, MATS JOHNSON, LORENZO ESCALANTE, MICHAEL THUNDER, and PAUL MANALAC (serving as alternate to Lorenzo Escalante since 2019).

93. The directors and officers of VGW Malta, the Chumba Defendant are: LAURENCE ESCALANTE, CHISTOPHER VELLA, AND NICOLE SPITERI BAILEY.

94. The corporate officers of VGW Luckyland and VGW US are not public and not ascertainable to the plaintiff. On information and belief, Mr. Laurence Escalante is a director of both VGW Luckyland and VGW US.

95. On June 30, 2022, VGW Holdings filed a financial statement with the Australian Securities & Investments Commission which was audited by Grant Thorton Audit Pty Ltd. (the "VGW 2022 Financials"). <u>Exhibit A</u>.

96. Per the VGW 2022 Financials, VGW Holdings recognized revenues from "Luckyland Slots" and "Chumba Casino" on its audited annual financial statements.

29

97. Per the VGW 2022 Financials, VGW Holdings reported full (100% effective) ownership and control over VGW LUCKYLAND INC., VGW US, INC. and VGW MALTA LIMITED.

98. Per the VGW 2022 Financials, Note 20, "VGW Holdings Limited ('the parent') exercises control over its subsidiaries: VGW Malta Holding Ltd., VGW Malta Limited, VGW US, Inc., VGW Luckyland Inc., … [and] VGW Corporation Pty Limited. … The parent and the subsidiaries are collectively referred to as the 'consolidated entity' and are constituent parts of these consolidated financial statements. Accordingly, the subsidiaries are considered as related parties in the separate financial statements of the parent entity rather than in the consolidated financial statements."

99. Additionally, per VGW 2022 Financials, Note 11, "The subsidiaries [VGW Malta Limited and VGW Luckyland Inc.] have share capital consisting solely of ordinary shares which are held directly by [VGW Holdings Limited]. The assets of the subsidiaries have been consolidated on a line-by-line basis in the consolidated financial statements of [VGW Holdings Limited]. The proportion of ownership interests equals the voting rights held by [VGW Holdings Limited]."

100. Per the VGW 2022 Financials lines cited in the paragraph above, VGW Malta and VGW Luckyland are not reported as independent streams of revenue on the VGW Holdings financial statement, despite being separate corporate entities providing payments to VGW Holdings. As such it is impossible to tell at this time what proportions of their revenues VGW Luckyland or VGW Malta provide to VGW Holdings.

101. Per the VGW 2022 Financials, VGW reported to shareholders for the 2022 fiscal year—revenue from "Chumba Casino" in the amount of $2,480,654,000.00 Australian

30

Dollars and revenue from "Luckyland Slots" of $779,378,000.00 Australian Dollars, followed by the sentence "The majority of the Group's customers are based in North America."

102.  The sum of the revenue reported on the VGW 2022 Financials attributable to "Chumba Casino" and "Luckyland Slots" in the previous paragraph is $3,260,032,000.00 Australian Dollars (the "Defendants' Games Revenue") ($2,480,654,000.00 plus $779,378,000.00).

103.  Per the VGW 2022 Financials, VGW reported expenses of $2,288,975,000.00 in the category "[s]weepstakes prizes" ("Defendants' Games Prize Expenses").

104.  Dividing Defendants' Games Revenue by Defendants' Games Prize Expenses (as defined above) reveals that Defendants' Games likely provide approximately 70.21% return to consumers.

105.  Brick-and-mortar casinos in Massachusetts are required by law to offer electronic slot machine games with an 80% or higher return to consumers. See 205 CMR 143.01(1)(k).

106.  The Luckyland Defendants from time-to-time advertise a return to consumers of over 90% on particular Luckyland Defendants' games.

107.  The majority of VGW Holdings customers are in North America, per the VGW 2022 Financials. See Ex. A, Director's Report, "Principal activities" ("The majority of the [VGW] Group's customers are based in North America.)

108.  VGW Holdings executives receive large amounts of compensation in the form of VGW HOLDINGS LIMITED equity. Per VGW 2022 Financials, pg. 7, VGW Holdings has "issued a Short-Term Incentive Plan (STI) for its executives." See Ex. A.

109. On December 21, 2021, Lawrence Escalante as Director of VGW Holdings filed a document titled "VGW Modern Slavery Statement 2021" with the Australian Securities & Investments Commission (the "Statement"). Exhibit B.

110. Per the Statement, VGW Holdings and its subsidiaries collectively employ 745 employees.

111. Per the Statement, "The recruitment process of VGW Group personnel is predominantly conducted from VGW's office in Perth, Western Australia."

112. Per the Statement, VGW Holdings provides support to its subsidiaries in making hiring decisions.

113. Per the Statement, VGW Holdings provides support to its subsidiaries in the form of services from independent contractors in the Philippines and Romania.

114. VGW Holdings has the same real owners as VGW Malta, VGW US, and VGW Luckyland (collectively, the "Subsidiaries"), as VGW Holdings Limited effectively owns 100% of the interests of both Subsidiaries.

115. VGW Holdings has pervasive control over the Subsidiaries as it effectively controls 100% of the voting interests of each Subsidiary.

116. Substantially all or all of the Subsidiaries value and revenues are passed on to the owners of VGW Holdings, including Mr. Laurence Escalante who on information and belief holds at least 60% equity in VGW Holdings.

117. VGW HOLDINGS LIMITED consolidates each Subsidiary on its annual audited financial statements.

118. The Subsidiaries share directors and intermingle their corporate recordkeeping, accounts, and decision-making functions with VGW Holdings and other Subsidiaries.

32

119.  For example, in 2022 VGW Malta reported on an audited financial statement submitted

to the Malta Business Registry on June 30, 2022 that VGW Malta engaged in "related

party transactions" within "the VGW Group of Companies" directly involving VGW

Malta's accounts totaling over 1,486,488,117€ in internal transactions.

120.  VGW Malta reported only 1,592,902,725€ in "Total Revenue" on its June 30, 2022

Finance Statement, indicating that the value of VGW Malta's related party transactions is

93% of the amount of revenue VGW Malta made for the same reporting period.

121.  On information and belief, each Subsidiary shares some or all board members and

directors with VGW Holdings.

122.  Mr. Laurence Escalante is a Director of VGW Holdings and of each Subsidiary (on

information and belief as to VGW US and VGW Luckyland).

123.  VGW Holdings created and maintains VGW US, VGW Luckyland, and VGW Malta

with the primary purpose of limiting potential liability to VGW Holdings for its knowing,

global violations of gambling licensing laws.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF M.G.L. c. 137, § 1. RECOVERY OF MONEY OR GOODS LOST AT GAMING; LIMITATIONS.

### (ALL DEFENDANTS)

124.  Plaintiff incorporates the foregoing allegations of paragraphs 1-123 as if fully set forth

herein and sues Defendants, collectively and each independently, for violations under

Massachusetts General Laws, c. 137, § 1.

33

125. M.G.L. c. 137, § 1 authorizes "any other person to sue for and recover in tort treble the value" of gambling losses of any Massachusetts citizen.

126. Specifically, M.G.L. c. 137, § 1 states:

"Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof."

127. Plaintiff is an "any other person" recognized by M.G.L. c. 137, § 1 (see M.G.L. c. 4, § 7, para. 23) and is authorized to proceed with litigation against Defendants to recover on Plaintiff's own behalf and for Plaintiff's own benefit all losses that the residents of Massachusetts have incurred from utilizing the Defendants' gaming sites that were incurred more than three months and up to a year before this date, and in amount that is treble the value of those losses by Massachusetts consumers.

128. Defendants' casino games constitute a game of dice, other game, a lottery, drawing, or other betting game as defined by M.G.L. c. 137, § 1 because players in the Commonwealth of Massachusetts have tendered money for the purchase of GC and SC, and then wagered those coins. By an element of chance (e.g., spinning a virtual slot machine, choosing numbers on a roulette table, or playing blackjack) Defendants create a right to credits and other things of value such as SC that can be redeemed directly for money in the bank account of a Massachusetts consumer.

34

129.  The wagering by and for Massachusetts consumers of purchased "Gold Coins" (GC) constitutes illegal gaming under M.G.L. c. 137, § 1 because those GC are things of value under Massachusetts law because GC are credits that allow for the extension and the privilege of continuing to play Defendants' games without additional charge.

130.  The wagering by and for Massachusetts consumers of purchased "Sweeps Coins" (SC) constitutes illegal gaming under M.G.L. c. 137, § 1 because those SC can be redeemed and purchased directly for cash payments and are the functional equivalent to cash in Defendants' games.

131.  As a direct and proximate result from Defendants' operations of their games and virtual casino, hundreds or thousands of Massachusetts residents have suffered losses.

132.  Plaintiff is now entitled to recover the monetary losses suffered by all Massachusetts residents lost from wagering at Defendants' games.

133.  As a direct and proximate result from Defendants' operation of their games, websites, social media presence, and virtual casinos, Massachusetts residents have paid and delivered money or another thing of value to another person for or in consideration of a lottery, or for or in consideration of a chance of drawing or obtaining any money, prize, or other thing of value in a lottery or policy game, pool, or combination, or other bet, and Plaintiff is now entitled to recover the consideration paid by all Massachusetts residents for or in consideration of a lottery or drawing during the time period allowed by M.G.L. c. 137, § 1.

WHEREFORE, Plaintiff seeks judgement against Defendants for all damages or losses, treble damages or losses, interest, costs, and attorneys' fees that Plaintiff is entitled to by law and the facts and circumstances of this case, and any other just and appropriate relief.

35

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## COUNT II

### VICARIOUS LIABILITY FOR VIOLATIONS OF M.G.L. c. 137, § 1.

### (VGW HOLDINGS LIMITED)

134. Plaintiff incorporates the foregoing allegations of paragraphs 1-133 as if fully set forth herein and sues VGW HOLDINGS LIMITED as set forth below.

135. Plaintiff alleges that VGW HOLDINGS LIMITED is vicariously liable for any and all actions by VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW US, INC. relating to these allegations. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968).

136. To attribute the actions of VGW Malta or VGW Luckyland to VGW Holdings, this Court must make a "determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose, based on evaluative consideration of twelve factors[.]" Attorney Gen. v M.C.K., Inc., supra at 555 n.19, citing Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 15-16 (1st Cir. 1985) (categorizing My Bread Baking Co. factors).

137. VGW HOLDINGS LIMITED has pervasive control over the Subsidiaries as outlined in the allegations herein and uses those Subsidiaries for an improper purpose.

138. As such, VGW HOLDINGS LIMITED is liable for the actions of the other Defendants regardless of whether VGW Holdings is independently liable under Count I.

WHEREFORE, Plaintiff seeks judgment against Defendants for all damages or losses, treble damages or losses, interest, costs, and attorney's fees that Plaintiff is entitled to by law and the facts and circumstances of this case, and other just and appropriate relief.

36

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of any and all issues in this action so triable by

Massachusetts law.

DATED: October 30, 2023

<div style="margin-left:40%">

Respectfully submitted,

FAIR GAMING ADVOCATES MA LLC

By its attorney


/s/ Quinn Heath
_____

Quinn Heath, Esq.
476 Windsor Street #1
Cambridge, MA 02141
Board of Bar Overseers No.: 709258
Telephone: (617) 468-8343
Email: quinn@cfsattorneys.com

*Attorney for Plaintiff*

</div>

I HEREBY ATTEST AND CERTIFY ON
November 30, 2023, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:
Asst. Clerk

37

# EXHIBIT A

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

**Australian Securities &**
**Investments Commission**

| Electronic Lodgement |
|---|
| Document No. 7EBX57073 |
| Lodgement date/time: 20-10-2022 16:00:27<br>Reference Id: 172404929 |

**Form 388**
Corporations Act 2001
**294, 295, 298-300, 307, 308, 319, 321, 322**
Corporations Regulations
1.0.08

# Copy of financial statements and reports

## Company details

Company name

**VGW HOLDINGS LIMITED**

ACN

**147 193 511**

## Reason for lodgement of statement and reports

A public company or a disclosing entity which is not a registered scheme or prescribed interest undertaking

**Dates on which financial year ends**

Financial year end date
**30-06-2022**

## Auditor's report

Were the financial statements audited?

**Yes**

Is the opinion/conclusion in the report modified? (The opinion/conclusion in the report is qualified, adverse or disclaimed)

**No**

Does the report contain an Emphasis of Matter and/or Other Matter paragraph?

**No**

## Details of current auditor or auditors

**Current auditor**

Date of appointment   **03-02-2017**

Name of auditor
**GRANT THORNTON AUDIT PTY LTD**

Address
**C/- GRANT THORNTON AUSTRALIA LIMITED**

Form 388 - Copy of financial statements and reports
VGW HOLDINGS LIMITED ACN 147 193 511

**LEVEL 17**
**383 KENT STREET**
**SYDNEY NSW 2000**

## Certification

I certify that the attached documents are a true copy of the original reports
required to be lodged under section 319 of the Corporations Act 2001.
**Yes**

## Signature

Select the capacity in which you are lodging the form
Secretary

I certify that the information in this form is true and complete and that I am
lodging these reports as, or on behalf of, the company.
**Yes**

## Authentication

This form has been authorised by
Name          Michael Phillip Anthony THUNDER , Secretary
Date          20-10-2022

**For more help or information**
Web               www.asic.gov.au
Ask a question?   www.asic.gov.au/question
Telephone         1300 300 630

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

# VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES

# ABN 36 147 193 511

# ANNUAL REPORT 2022

# VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES

## Contents

| | |
|---|---|
| Corporate Directory | 2 |
| Directors' Report | 3 |
| Auditor's Independence Declaration | 9 |
| Financial report | |
|     Consolidated Statement of profit and loss and other comprehensive income | 10 |
|     Consolidated Statement of financial position | 11 |
|     Consolidated Statement of changes in equity | 12 |
|     Consolidated Statement of cash flows | 13 |
|     Notes to the consolidated financial statements | 14 |
|     Directors' declaration | 37 |
| Independent Auditor's Report | 38 |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Corporate Directory

| | |
|---|---|
| Directors | **Laurence Escalante**<br>Executive Chairman & Chief Executive Officer |
| | **Mats Johnson**<br>Executive Director & Chief Marketing Officer |
| | **Lorenzo Escalante**<br>Non-executive Director |
| | **Paul Manalac**<br>Alternate Director to Lorenzo Escalante |
| Company secretary | **Michael Thunder** |
| Registered office &<br>principal place of<br>business | Level 11<br>Australia Place<br>15 - 17 William Street<br>Perth, WA 6000<br>Telephone: +61 8 6145 1801 |
| Share registry | Advanced Share Registry Services<br>110 Stirling Hwy, Nedlands WA 6009 |
| Auditor | Grant Thornton Audit Pty Ltd<br>Level 17, 383 Kent Street, Sydney, NSW 2000 |
| Website | http://www.vgw.co |

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

The Directors of VGW Holdings Limited present their report together with the financial statements of the consolidated entity (referred to hereafter as the "consolidated entity" or "Group") for the year ended 30 June 2022.

### Principal activities

The principal activities of the Group during the financial year were the development and distribution of online social games offering virtual currency gaming and sweepstakes prize promotions. There have been no significant changes in the nature of these activities during the year.

The majority of the Group's customers are based in North America.

### Review of operations and financial results

Revenue from operations was $3,457.1 million (2021: $2,224.8 million), up 55%.

The increased group revenue was primarily driven by the Chumba and Luckyland brands. This strong revenue growth was the result of continued development of our operations, and customer engagement with our products, games and promotions.

Marketing spend was up very significantly at $235.3 million (2021: $80.9 million). The broader macroeconomic environment of the continued impacts of Covid-19 provided both challenges and opportunities for the business.

Promotional sweepstakes prizes of $2,289.0 million (2021: $1,564.3 million) increased 46% broadly in line with revenue.

Operating expenditure also increased to support growth across business operations.

The consolidated profit after tax of the Group amounted to $454.0 million (2021: $294.7 million). As of 30 June 2022, the Group is in a net asset surplus position of $204.9 million (2021: $94.5 million).

The Group generated a net operating cash inflow of $492.2 million. A net investing outflow of $2.8 million, and a net financing cash outflow of $412.5 million which included the payment of partially franked dividends during the year, totalling $412.7 million.

The Directors believe the Group remains in a strong position to finance the continued growth of its operations. Revenue and margin growth, together with a measured growth in operating costs, are in line with the Group's strategic goals and deliverables.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

**Significant Changes in State of Affairs**

There were no significant changes in the state of affairs of the consolidated entity during the financial year.

**Events after the Reporting Period**

1. On 28 July 2022, VGW issued 41.0 million loan funded shares to the Directors and some executives as part of its employee incentive program at $4.01 per share.
2. A lease agreement was signed in August 2022 for new office premises in Perth. The lease commences on 1 August 2022.
3. On 30 August 2022, the Company paid a twenty-cent per ordinary share partially franked dividend, totaling $132.7 million.
4. In September 2022 VGW entered into an agreement in principle to settle a putative class action in the state of Kentucky for US$11.75 million.

**Likely Future Developments**

The Group's strategic focus is to further develop its product offerings in its key North American markets, as well as potentially to new geographic locations.

**Environmental Legislation**

The Group's operations are not regulated by any significant environmental regulation under a law of the Commonwealth or of a State or Territory in Australia.

4

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

**Directors**

The directors of the Company at any time during or since the end of the financial year are:

| Name, qualifications and Independence status | Experience, special responsibilities and other directorships |
|---|---|
| **Laurence ESCALANTE**<br>Executive Chairman &<br>Executive Director | • Laurence is the Founder of VGW and has been the Managing Director since the Company's founding in 2010.<br>• Laurence has 16 years' experience as an executive, founder and investor in the game industry, founding VGW Holdings Limited, Anino Mobile and White Knight Games.<br>• He studied Economics and Actuarial Studies at Macquarie University in Sydney and has 10 years financial planning experience as a technical and investment specialist.<br>• Director from 4 November 2010, Executive Chairman from 5 August 2019. |
| **Mats JOHNSON**<br>Executive Director | • Mats is a senior technology and online gaming executive with significant experience in establishing and growing both public and private online businesses globally.<br>• Mats previously held roles as a Director at Coral Eurobet, General Manager at Centrebet and CEO at Playsafe.<br>• He has led large teams and formulated global expansion strategies delivering significant and profitable growth in both new and established markets.<br>• Mats has 21 years of digital and gaming sector expertise, alongside comprehensive M&A experience, having been actively involved in several successful exits of online gaming companies, including the £2.18Bn sale of Coral Eurobet to Gala Group.<br>• Director from 1 November 2015. |
| **Lorenzo ESCALANTE**<br>Non-executive Director | • Lorenzo is an experienced systems and business intelligence analyst specialising in quantitative methods for improving business operational efficiency and productivity. He has over 30 years' experience in the corporate IT sector.<br>• He has provided business intelligence consultancies to Chevron, BHP Billiton and Woodside Petroleum. He also had been employed by BHP Iron Ore, AAPT, OnePath (ANZ Wealth) and LandCorp (DevelopmentWA).<br>• Lorenzo is still actively involved with the charitable "good works" of St. Vincent de Paul Society (almost 25 years now) at the grassroots level and is currently the President of Vinnies North Ryde Conference.<br>• He is a Councillor for the New South Wales Chess Association and a member of the Board of Directors of "PLM Club67" (Pamantasan ng Lungsod ng Maynila) alumni group in Manila, Philippines.<br>• Lorenzo is a member of the Australian Institute of Company Directors (AICD).<br>• Director from 5 August 2014 |
| **Paul MANALAC**<br>Alternate Director to<br>Lorenzo Escalante | • Paul was the Alternate Director to Lorenzo Escalante, appointed on 23 August 2019 (to 5 September 2019).<br>• Paul was reappointed as Alternate Director to Lorenzo Escalante on 16 December 2019. |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

# VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

**Company Secretary**
Mr Michael Thunder

| Meetings of Directors | Full Board | |
| --- | --- | --- |
| | Attended | Held |
| Laurence Escalante | 12 | 14 |
| Mats Johnson | 14 | 14 |
| Lorenzo Escalante | 12 | 14 |
| Paul Manalac | 2 | 14 |

Held represents the number of meetings held during the time the director held office or was a member of the relevant committee.

**Dividends**

During the financial year ended 30 June 2022, the Company paid the following partially franked dividends (2021: $284.6 million):

| Date | Dividend per Ordinary Share | Total Dividend |
| --- | --- | --- |
| 1 Oct 2021 | $0.20 | $122.9m |
| 20 Dec 2021 | $0.17 | $104.9m |
| 1 Mar 2022 | $0.18 | $111.2m |

On 2 July 2021, the Company paid a twelve-cent per ordinary share partially franked dividend, totaling $73.8 million. This dividend was declared on 28 June 2021.

The franking percentage of the dividends paid in FY2022 was disclosed on distribution statements provided to shareholders.

6

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

**Unissued shares under option**

Unissued ordinary shares of VGW Holdings Limited at the date of this report are:

| Options issued under | Grant Date | Number of Options | Expiry Date | Exercise Price ($) |
|---|---|---|---|---|
| LTIP Tranche 4 (a) | 31 Jan 2019 | 210,000 | 31 Jan 2023 | 0.20 |
| LTIP July 2020 Tranche | 24 July 2020 | 580,606 | 24 Jul 2023 | 0.25 |
| LTIP Tranche 7 | 31 May 2021 | 2,417,001 | 30 Jun 2024 | 0.85 |
| **TOTAL** | | **3,207,607** | | |

The above options were issued in accordance with below:

**Long-term Incentive Plan (LTIP) and Short-term Incentive Plan (STI)**

In January 2017, VGW established a Long-Term Incentive Plan (LTIP) which is part of VGW's reward strategy in support of the achievement of the Company's business strategy. On 31 January 2019, 24 July 2020 and 31 May 2021, the Company issued further tranches of options under the terms of the LTIP.

Additionally, the company issued a Short-Term Incentive plan for its executives.

**Shares issued during or since the end of the year as a result of exercise**

During or since the end of the financial year, VGW Holdings Limited issued ordinary shares as a result of the exercise of options as follows:

| Date options granted | Issue price of shares | Number of shares issued |
|---|---|---|
| 31 Jan 2019 | $0.40 | 133,333 |
| 24 Jul 2020 | $0.25 | 4,737,637 |
| 31 May 2021 | $0.85 | 1,076,499 |
| **TOTAL** | | **5,947,469** |

**Insurance of officers**

During the year, the Company paid a premium to insure officers of the Group. The officers of the Group covered by the insurance policy include all Directors.

The liabilities insured are legal costs that may be incurred in defending civil or criminal proceedings that may be brought against the officers in their capacity as officers of the Group, and any other payments arising from liabilities incurred by the officers in connection with such proceedings, other than where such liabilities arise out of conduct involving a wilful breach of duty by the officers or the improper use by the officers of their position or of information to gain advantage for themselves or someone else or to cause detriment to the Group.

Details of the amount of the premium paid in respect of insurance policies are not disclosed as such disclosure is prohibited under the terms of the contract.

The Group has not otherwise, during or since the end of the financial year, except to the extent permitted by law, indemnified or agreed to indemnify any current or former officer of the Group against a liability incurred as such by an officer.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## Directors' Report

**Indemnity of auditors**

The Group has agreed to indemnify its auditors, Grant Thornton, to the extent permitted by law, against any claim by a third party arising from the Group's breach of its agreement. The indemnity requires the Group to meet the full amount of any such liabilities including a reasonable amount of legal costs.

**Auditor's Independence Declaration**

The lead auditor's independence declaration for the year ended 30 June 2022 has been received and can be found on page 9 of the financial report.

**Proceedings on behalf of the Company**

No person has applied to the Court under section 237 of the Corporations Act 2001 for leave to bring proceedings on behalf of the Company, or to intervene in any proceedings to which the Company is a party, for the purpose of taking responsibility on behalf of the Company for all or part of those proceedings.

**Rounding of Amounts**

The Company is a type of Company referred to in ASIC Corporations (Rounding in Financial/Directors' Reports) Instrument 2016/191 and therefore the amounts contained in this report and in the financial report have been rounded to the nearest $1,000, or in certain cases, to the nearest dollar.

Signed in accordance with a resolution of the Directors:

Laurence ESCALANTE
Director
4 October 2022

 **Grant Thornton**

**Grant Thornton Audit Pty Ltd**
Level 17
383 Kent Street
Sydney NSW 2000
Locked Bag Q800
Queen Victoria Building NSW
1230

T +61 2 8297 2400

# Auditor's Independence Declaration

## To the Directors of VGW Holdings Limited

In accordance with the requirements of section 307C of the *Corporations Act 2001*, as lead auditor for the audit of VGW Holdings Limited for the year ended 30 June 2022, I declare that, to the best of my knowledge and belief, there have been:

a   no contraventions of the auditor independence requirements of the *Corporations Act 2001* in relation to the audit; and

b   no contraventions of any applicable code of professional conduct in relation to the audit.

*Grant Thornton*

Grant Thornton Audit Pty Ltd
Chartered Accountants

*R J Isbell*

R J Isbell
Partner – Audit & Assurance

Sydney, 4 October 2022

www.grantthornton.com.au
ACN-130 913 594

Grant Thornton Audit Pty Ltd ACN 130 913 594 a subsidiary or related entity of Grant Thornton Australia Limited ABN 41 127 556 389 ACN 127 556 389.
'Grant Thornton' refers to the brand under which the Grant Thornton member firms provide assurance, tax and advisory services to their clients and/or
refers to one or more member firms, as the context requires. Grant Thornton Australia Limited is a member firm of Grant Thornton International Ltd (GTIL).
GTIL and the member firms are not a worldwide partnership. GTIL and each member firm is a separate legal entity. Services are delivered by the member
firms. GTIL does not provide services to clients. GTIL and its member firms are not agents of, and do not obligate one another and are not liable for one
another's acts or omissions. In the Australian context only, the use of the term 'Grant Thornton' may refer to Grant Thornton Australia Limited ABN 41 127
556 389 ACN 127 556 389 and its Australian subsidiaries and related entities. Liability limited by a scheme approved under Professional Standards
Legislation.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER
## COMPREHENSIVE INCOME FOR THE YEAR ENDED 30 JUNE 2022

| From continuing operations | Note | 2022 $'000 | 2021 $'000 |
|---|---|---|---|
| Revenue from contracts with customers | 4 | 3,457,148 | 2,224,757 |
| Sweepstakes prizes | | (2,288,975) | (1,564,254) |
| Merchant and affiliate fee | | (161,462) | (106,440) |
| Finance income | 5 | 89 | 51 |
| Finance costs | 5 | (148) | (169) |
| Finance costs – interest expense on lease liabilities | 5 | (1,479) | (802) |
| Foreign currency gain/(loss) | 5 | 10,464 | (5,190) |
| Other income | 5 | 9 | 36 |
| Marketing and advertising fees | 5 | (235,259) | (80,946) |
| Legal and professional fees | | (33,102) | (21,305) |
| Employee benefits expense | 7 | (80,408) | (54,023) |
| Share-based payments expense | | (8,171) | (1,297) |
| Depreciation and amortisation expense | | (5,977) | (6,834) |
| Technology and other communication expense | | (31,105) | (16,893) |
| Property and occupancy expense | | (1,589) | (1,190) |
| General and administration expense | | (15,931) | (7,159) |
| | | (2,853,044) | (1,866,415) |
| **Profit before income tax** | | 604,104 | 358,342 |
| Income tax expense | 6 | (150,103) | (63,655) |
| **Profit for the year attributable to members of the Group** | | 454,001 | 294,687 |
| **Other comprehensive income, net of income tax** | | (16,218) | (1,296) |
| **Total comprehensive income for the year attributable to the owners of VGW Holdings Limited** | | 437,783 | 293,391 |

| Earnings per share | | Cents | Cents |
|---|---|---|---|
| From continuing operations: | | | |
| - Basic earnings per share | 22 | 73.65 | 48.99 |
| - Diluted earnings per share | 22 | 72.81 | 48.36 |

This Consolidated Statement of Profit or Loss and Other Comprehensive Income is to be read in conjunction with the accompanying notes to the financial statements.

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## CONSOLIDATED STATEMENT OF FINANCIAL POSITION
## AS OF 30 JUNE 2022

| | Note | 2022 $'000 | 2021 $'000 |
|---|---|---|---|
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | 8 | 369,471 | 298,238 |
| Trade and other receivables | 9 | 45,382 | 18,788 |
| Prepayments and other short-term assets | 10 | 31,418 | 20,920 |
| Current tax assets | | 1,484 | – |
| **Total current assets** | | **447,755** | **337,946** |
| Non-current assets | | | |
| Property, plant and equipment | 12 | 4,313 | 3,069 |
| Right-of-use assets | 13 | 14,499 | 9,677 |
| Intangible assets | 14 | 1,173 | 3,082 |
| Deferred tax assets | 6 | 4,068 | 5,619 |
| Financial assets | 18 | 970 | 532 |
| **Total non-current assets** | | **25,023** | **21,979** |
| **Total assets** | | **472,778** | **359,925** |
| **Liabilities** | | | |
| Current liabilities | | | |
| Trade and other payables | 15 | 53,396 | 96,224 |
| Contract liability | 16 | 131,883 | 75,353 |
| Provisions | 17 | 65,265 | 42,847 |
| Current tax liability | | 550 | 39,173 |
| Lease liability | 13 | 3,316 | 2,208 |
| **Total current liabilities** | | **254,410** | **255,805** |
| Non-current liabilities | | | |
| Lease liability | 13 | 12,539 | 8,705 |
| Provisions | 17 | 964 | 879 |
| **Total non-current liabilities** | | **13,503** | **9,584** |
| **Total liabilities** | | **267,913** | **265,389** |
| **NET ASSETS** | | **204,865** | **94,536** |
| **Equity** | | | |
| Share capital | 19 | 37,636 | 34,283 |
| Reserves | 29 | (9,256) | 606 |
| Retained earnings | | 176,485 | 59,647 |
| **TOTAL EQUITY** | | **204,865** | **94,536** |

This Consolidated Statement of Financial Position is to be read in conjunction with the accompanying notes to the financial statements.

11

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

**VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES**
**CONSOLIDATED STATEMENT OF CHANGES IN EQUITY**
**FOR THE YEAR ENDED 30 JUNE 2022**

| | Share Capital $'000 | Share-based Payment Reserve $'000 | Foreign Currency Reserve $'000 | Financial Assets at Fair Value through OCI $'000 | Retained Earnings $'000 | Total Equity $'000 |
|---|---|---|---|---|---|---|
| Balance at 1 July 2020 | 25,438 | 1,584 | 874 | - | 47,743 | 75,639 |
| Reclassification of options which have been exercised | - | (1,478) | - | - | 1,478 | - |
| Reclassification of options which have lapsed | - | (374) | - | - | 374 | - |
| Employees' long-term incentive plan share options | - | 1,271 | - | - | - | 1,271 |
| Exercise of options (Note 19) | 8,033 | - | - | - | - | 8,033 |
| Issue of loan funded shares (Note 21a) | - | 25 | - | - | - | 25 |
| Dividends declared and/or paid (Note 28) | - | - | - | - | (284,635) | (284,635) |
| Settlement of loan funded shares (Note 19) | 812 | - | - | - | - | 812 |
| Profit attributable to equity holders | - | - | - | - | 294,687 | 294,687 |
| Other comprehensive income | - | - | (1,296) | - | - | (1,296) |
| Total comprehensive (loss)/income for the period | - | - | (1,296) | - | 294,687 | 293,391 |
| **Balance as at 30 June 2021** | **34,283** | **1,028** | **(422)** | **-** | **59,647** | **94,536** |

| Consolidated entity | Share Capital $'000 | Share-based Payment Reserve $'000 | Foreign Currency Reserve $'000 | Financial Assets at Fair Value through OCI $'000 | Retained Earnings $'000 | Total Equity $'000 |
|---|---|---|---|---|---|---|
| Balance at 1 July 2021 | 34,283 | 1,028 | (422) | - | 59,647 | 94,536 |
| Reclassification of options which have been exercised | - | (1,815) | - | - | 1,815 | - |
| Employees' long-term incentive plan share options | - | 8,171 | - | - | - | 8,171 |
| Exercise of options (Note 19) | 2,153 | - | - | - | - | 2,153 |
| Dividends declared and/or paid (Note 28) | - | - | - | - | (338,978) | (338,978) |
| Settlement of loan funded shares (Note 19) | 1,200 | - | - | - | - | 1,200 |
| Profit attributable to equity holders | - | - | - | - | 454,001 | 454,001 |
| Other comprehensive income | - | - | (16,162) | (56) | - | (16,218) |
| Total comprehensive (loss)/income for the period | - | - | (16,162) | (56) | 454,001 | 437,783 |
| **Balance as at 30 June 2022** | **37,636** | **7,384** | **(16,584)** | **(56)** | **176,485** | **204,865** |

The Consolidated Statement of Changes in Equity is to be read in conjunction with the accompanying notes to the financial statements.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

**VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**FOR THE YEAR ENDED 30 JUNE 2022**

| | Note | 2022 $'000 | 2021 $'000 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Receipts from customers | | 3,490,472 | 2,258,640 |
| Payment to suppliers and employees, prizes | | (2,807,953) | (1,836,881) |
| Income tax paid | | (190,394) | (52,144) |
| Interest received | 5 | 89 | 58 |
| Net cash from operating activities | 24 | **492,214** | **369,673** |
| | | | |
| **Cash flows from investing activities** | | | |
| Payments for property, plant and equipment | | (2,309) | (1,480) |
| Investment in financial assets | | (486) | (532) |
| Net cash used in investing activities | | **(2,795)** | **(2,012)** |
| | | | |
| **Cash flows from financing activities** | | | |
| Settlement of loan funded shares | | 1,200 | 812 |
| Proceeds from issue of shares | | 2,603 | 8,033 |
| Dividend payments | 28 | (412,738) | (210,875) |
| Repayment of lease liabilities | | (3,553) | (3,004) |
| Net cash used in financing activities | | **(412,488)** | **(205,034)** |
| | | | |
| Net increase in cash and cash equivalents | | 76,931 | 162,627 |
| Cash and cash equivalents at beginning of year | | 298,238 | 142,094 |
| Effects of exchange rate changes | | (5,698) | (6,483) |
| Cash and cash equivalents at end of year | 8 | **369,471** | **298,238** |

The Consolidated Statements of Cash Flows are to be read in conjunction with the notes to the financial statements.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

# VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

## 1    General Information and Statement of Compliance

The financial report includes the consolidated financial statements and notes of VGW Holdings Limited and controlled entities ("Group"). The financial report is presented in Australian dollars, which is VGW's functional and presentation currency.

The financial report consists of the financial statements, notes to the financial statements and the directors' declaration.

VGW Holdings Limited is an unlisted public company limited by shares, incorporated and domiciled in Australia.

These financial statements are general purpose financial statements that have been prepared in accordance with Australian Accounting Standards – Simplified Disclosures and the Corporations Act 2001. VGW Holdings Limited is a for-profit entity for the purpose of preparing financial statements.

The consolidated financial statements for the year ended 30 June 2022 were approved and authorised for issue by the Board of Directors on 4 October 2022.

These financial statements for the year reporting period ended 30 June 2022 have been prepared on an accruals basis and are based on historical costs modified by the revaluation of selected non-current assets and financial instruments for which a fair value basis of accounting has been applied.

## 2    New or amended Accounting Standards and Interpretations adopted

The International Financial Reporting Interpretations Committee (IFRIC) addressed in a paper issued April 2021 considerations for how the Group should account for costs of configuring or customising a supplier's application software in a Cloud Computing or Software as a Service (SaaS) arrangement. The agenda decision has been adopted with no material impact to the financial statements.

The Group has adopted all other new or amended Accounting Standards and Interpretations issued by the Australian Accounting Standards Board ('AASB') that are mandatory for the current period. Any new or amended Accounting Standards or Interpretations that are not yet mandatory have not been early adopted.

### Conceptual Framework for Financial Reporting (Conceptual Framework)
The Group has adopted the revised Conceptual Framework from 1 January 2020. The Conceptual Framework contains new definition and recognition criteria as well as new guidance on measurement that affects several Accounting Standards, but it has not had a material impact on the Group's financial statements.

### AASB 1060 General Purpose Financial Statements - Simplified Disclosures for For-Profit and Not-for-Profit Tier 2 Entities
The Group has adopted AASB 1060 from 1 July 2021. The standard provides a new Tier 2 reporting framework with simplified disclosures that are based on the requirements of IFRS for SMEs. As a result, there is increased disclosure in these financial statements for key management personnel, related parties, tax and financial instruments.

There was no impact on the amounts recognised, measured and classified in the financial statements of the Group as a result of the change in basis of preparation.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

**VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022**

### 3    Summary of Accounting Policies

**Overall considerations**

The consolidated financial statements have been prepared using the significant accounting policies and measurement bases summarised below.

**a.   Principles of Consolidation**

The consolidated financial statements incorporate all of the assets, liabilities and results of the Parent and its subsidiaries as at 30 June 2022. Subsidiaries are entities the parent controls. The parent controls an entity when it is exposed to, or has right to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity. Details for the subsidiaries are provided in Note 11: Controlled Entities.

The assets, liabilities and results of all subsidiaries are fully consolidated into the financial statements of the Group from the date on which control is obtained by the Group. The consolidation of a subsidiary is discontinued from the date that control ceases. Intercompany transactions, balances, unrealised gains or losses on transactions between the group entities are fully eliminated on consolidation. Accounting policies of subsidiaries have been changed and adjustments made where necessary to ensure uniformity of the accounting policies adopted by the Group. All subsidiaries have a reporting date of 30 June.

**b.   Income Tax**

The income tax expense/(benefit) for the year comprises current and deferred income tax expense/(benefit).

Current income tax expense charged to profit or loss is the tax payable on taxable income. Current tax liabilities/(assets) are therefore measured at the amounts expected to be paid to/(received from) the relevant taxation authority, using tax rates enacted or substantively enacted at the reporting date.

Deferred income tax expense reflects movements in deferred tax asset and deferred tax liability balances during the year. Current and deferred income tax expense/(benefit) is charged or credited outside profit or loss when the tax relates to items that are recognised outside profit or loss. Except for business combinations, no deferred income tax is recognised from the initial recognition of an asset or liability where there is no effect on accounting or taxable profit or loss.

Deferred tax assets and liabilities are calculated at the tax rates that are expected to apply to the period when the asset is realised or the liability is settled, and their measurement also reflects the manner in which management expects to recover or settle the carrying amount of the realised asset or liability.

Deferred tax assets relating to temporary differences and unused tax losses are recognised only to the extent that it is probable that future taxable profit will be available against which the benefits of the deferred tax asset can be utilised.

VGW Holdings Limited and its wholly owned Australian entities are part of a tax consolidated group under Australian taxation law. VGW Holdings Limited is the head entity of the Australian tax consolidated group which formed in FY2019.

Entities within the tax consolidated group have entered into a tax funding agreement and a tax sharing agreement with the head entity. The tax sharing agreement specifies methods of allocating any tax liability in the event the head entity defaults on its group payment obligations and the treatment where a member exits the tax consolidated group. The tax funding agreement specifies the methods of determining each group member's liability to the head entity to enable the head entity to pay the group's tax liability.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 3    Summary of Accounting Policies (continued)

#### c.   Property, Plant and Equipment

Plant and equipment are measured on the cost basis and are therefore carried at cost less accumulated depreciation and any accumulated impairment losses. In the event the carrying amount of plant and equipment is greater than its estimated recoverable amount, the carrying amount is written down immediately to its estimated recoverable amount and impairment losses are recognised in profit or loss. A formal assessment of recoverable amount is made when impairment indicators are present (refer to note 3(f) for details of impairment).

The cost of fixed assets includes the expenditure that is directly attributable to the acquisition of the items.

Subsequent costs are included in the asset's carrying amount or recognised as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Group and the cost of the item can be measured reliably. All other repairs and maintenance are recognised as expenses in profit or loss during the financial period in which they are incurred.

The depreciable amount of all fixed assets is depreciated on a straight-line basis over the assets useful life to the Group commencing from the time the asset is held ready for use. Depreciation is recognised in profit or loss.

The depreciation rate used for the class of depreciable assets are:
-   Furniture and Fittings: 1 - 5 years
-   Office and Computer Equipment: 3 years
-   Software: 3 years
-   Leasehold improvements: 1 – 7 years
-   Motor vehicles: 8 years

The assets' residual values and useful lives are reviewed, and adjusted if appropriate, at the end of each reporting period.

#### d.   Leases

The Group recognises a right-of-use asset and a lease liability at the lease commencement date. The right-of-use asset is initially measured at cost, which comprises the initial amount of the lease liability adjusted for any lease payments made at or before the commencement date, plus any initial direct costs incurred and an estimate of costs to dismantle and remove the underlying asset or to restore the underlying asset or the site on which it is located, less any lease incentives received.

The right-of-use asset is subsequently depreciated using the straight-line method from the commencement date to the earlier of the end of the useful life of the right-of-use assets or the end of the lease term. The estimated useful lives of right-of-use assets are determined on the same basis as those of property and equipment. In addition, the right-of-use asset is periodically reduced by impairment losses, if any, and adjusted for certain remeasurements of the lease liability.

The lease liability is initially measured at the present value of the lease payments that are not paid at the commencement date discounted using the effective interest rate implicit in the lease or, if that rate cannot be readily determined, the group's incremental borrowing rate. The Group uses its incremental borrowing rate as the discount rate.

Lease payments included in the measurement of the lease liability include: (i) fixed payments; (ii) variable lease payments that depend on an index or a rate, amounts; (iii) amounts expected to be payable under a residual value guarantee; and (iv) the exercise price under a purchase option or renewal option that the Group is reasonably certain to exercise, and penalties for early termination of a lease unless the Group is reasonably certain of not terminating early.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 3    Summary of Accounting Policies (continued)

The lease liability is measured at the amortised cost using the effective interest method. It is re-measured when there is a change in future lease payments arising from a change in an index or rate, if there is a change in the Group's estimate of the amount expected to be payable under a residual value guarantee, or if the Group changes its assessment of whether it will exercise a purchase, extension or termination option.

When the lease liability is remeasured in this way, a corresponding adjustment is made to the carrying amount of the right-of-use asset or is recorded in the consolidated profit or loss if the carrying amount of the right-of-use asset has been reduced to zero.

Where the Group is a lessee for short-term leases and leases for which the underlying asset is of low value, payments on these lease agreements are recognised as an expense on a straight-line basis over the lease term. Associated costs, such as maintenance and insurance, are expensed as incurred.

### e.   Financial Instruments

**Recognition and derecognition**
Financial assets and financial liabilities are recognised when the Group becomes a party to the contractual provisions of the financial instrument and are measured initially at fair value adjusted by transactions costs, except for those carried at fair value through profit or loss, which are measured initially at fair value. Subsequent measurement of financial assets and financial liabilities are described below.

Financial assets are derecognised when the contractual rights to the cash flows from the financial asset expire, or when the financial asset and substantially all the risks and rewards are transferred. A financial liability is derecognised when it is extinguished, discharged, cancelled or expires.

**Classification and initial measurement of financial assets**
Except for those trade receivables that do not contain a significant financing component and are measured at the transaction price in accordance with AASB 15, all financial assets are initially measured at fair value adjusted for transaction costs (where applicable).

**Subsequent measurement of financial assets**
For the purpose of subsequent measurement, financial assets, other than those designated and effective as hedging instruments, are classified into the following categories upon initial recognition:
- financial assets at amortised cost
- financial assets at fair value through profit or loss (FVPL)
- debt instruments at fair value through other comprehensive income (FVOCI)
- equity instruments at fair value through other comprehensive income (FVOCI)

Classifications are determined by both:
- The entity's business model for managing the financial asset
- The contractual cash flow characteristics of the financial assets

All income and expenses relating to financial assets that are recognised in profit or loss are presented within finance costs, finance income or other financial items, except for impairment of trade receivables which is presented within other expenses.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

**3    Summary of Accounting Policies (continued)**

**Financial assets at amortised cost**
Financial assets are measured at amortised cost if the assets meet the following conditions (and are not designated as FVPL):

- they are held within a business model whose objective is to hold the financial assets and collect its contractual cash flows
- the contractual terms of the financial assets give rise to cash flows that are solely payments of principal and interest on the principal amount outstanding

After initial recognition, these are measured at amortised cost using the effective interest method. Discounting is omitted where the effect of discounting is immaterial. The Group's cash and cash equivalents, trade and most other receivables fall into this category of financial instruments.

**Classification and measurement of financial liabilities**
The Group's financial liabilities include borrowings and trade and other payables.

Financial liabilities are initially measured at fair value, and, where applicable, adjusted for the transaction costs. Subsequently, financial liabilities are measured at amortised cost using the effective interest method. All interest-related charges and, if applicable, changes in an instrument's fair value that are reported in profit or loss are included within finance costs or finance income.

**f.    Impairment**

All impairment losses are recognised in the consolidated statement of profit or loss and other comprehensive income. Any cumulative loss in respect of an available-for-sale financial asset recognised previously in equity is transferred to the statement of comprehensive income.

The Company makes use of a simplified approach in accounting for trade receivables as well as contract assets and records the loss allowance at the amount equal to the expected lifetime credit losses. In using this practical expedient, the Company uses its historical experience, external indicators and forward-looking information to calculate the expected credit losses using a provision matrix.

The Company assesses impairment of trade receivables on a collective basis as they possess credit risk characteristics based on days past due. The Company has not experienced credit losses historically and therefore has made no allowance for trade receivables.

**g.    Intangibles other than Goodwill**

**Software and website development costs**
Software and website development costs are capitalised only when the company identifies that the project will deliver future economic benefits and these benefits can be measured reliably.

Software development costs have a finite life and are initially recorded at cost and amortised on a systematic basis over five to eight years matched to the future economic benefits over the useful life of the asset.

**Malta Gaming Authority licence**
Malta Gaming Authority licence is initially recorded at cost and amortised based on its economic life of nine years.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 3    Summary of Accounting Policies (continued)

#### h.   Employee Benefits

**Short-term employee benefits**

Provision is made for the Group's obligation for short-term employee benefits. Short-term employee benefits are benefits (other than termination benefits) that are expected to be settled wholly within 12 months after the end of the annual reporting period in which the employees render the related service, including wages, salaries and annual leave. Short-term employee benefits are measured at the (undiscounted) amounts expected to be paid when the obligation is settled.

The Group's obligations for short-term employee benefits such as wages, salaries and annual leave are recognised as part of current trade and other payables in the statement of financial position.

**Long-term employee benefits**

Group's obligation in respect of long-term employee benefits is the amount of future benefit that employees have earned in return for their service in the current and prior periods. That benefit is discounted to determine its present value, and recognised in profit or loss in the period in which they arise.

**Equity-settled compensation**

The Group operates an employee share and option plan. Share-based payments are amortised over the vesting periods. The corresponding amount is recorded in the share-based payment reserve.

#### i.   Provisions, Contingent Liabilities and Contingent Assets

Provisions are recognised when the Group has a legal or constructive obligation, as a result of past events, for which it is probable that an outflow of economic benefits will result, and that outflow can be reliably measured.

Provisions are measured at the estimated expenditure required to settle the present obligation, based on the most reliable evidence available at the reporting date, including the risks and uncertainties associated with the present obligation. Where there are a number of similar obligations, the likelihood that an outflow will be required in settlement is determined by considering the class of obligations as a whole. Provisions are discounted to their present values, where the time value of money is material.

Any reimbursement that the Group can be virtually certain to collect from a third party with respect to the obligation is recognised as a separate asset. However, this asset may not exceed the amount of the related provision.

No liability is recognised if an outflow of economic resources as a result of present obligation is not probable. Such situations are disclosed as contingent liabilities, unless the outflow of resources is remote in which case no liability is recognised.

The Group has adopted a policy of recognising a liability for redeemable prizes.

#### j.   Cash and Cash Equivalents

Cash and cash equivalents comprise cash on hand and demand deposits held at call with banks and payment platforms, together with other short term, highly liquid investments that are readily convertible into known amounts of cash and which are subject to an insignificant risk of changes in value.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

**VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022**

**3     Summary of Accounting Policies (continued)**

**k.   Revenue**

**Chumba Casino, Global Poker and Luckyland Slots Revenue**

Revenues from player purchases on the Chumba Casino, Global Poker and Luckyland Slots are recognised gross of merchant fees. The risks and rewards of the revenue earned lie with the Company and not with payment platform providers. Merchant fees are recognised as an expense in the period they are incurred.

In accordance with AASB 15 Revenue from Contracts with Customers, player purchases of gold coins are recognised over time as revenue based on the player retention period and amortised accordingly.

**Fend Off Revenue**

Fend Off revenues are recognised at point in time when player purchases gold coins.

**Facebook and Shared App Revenue**

Revenues from Facebook and Shared App are recognised on a gross basis before taking into account the service fee on revenue charged by Facebook and Shared App. Revenues are recognised at point in time when player purchases gold coins.

**l.   Interest Income**

Interest income is reported on an accruals basis using the effective interest method.

**m.   Goods and Services Tax**

Revenue, expenses and assets are recognised net of the amount of goods and services tax (GST), except where the amount of GST incurred is not recoverable from the taxation authority.

Receivables and payables are stated with the amount of GST included. The net amount of GST recoverable from, or payable to, the tax authorities is included as a current asset or liability in the statement of financial position.

Cash flows are included in the consolidated statement of cash flows on a gross basis. The GST components of cash flows arising from investing or financing activities which are recoverable from the tax authorities are presented as operating cash flows included in payment to suppliers.

**n.   Critical Accounting Estimates and Judgements**

The preparation of the financial statement requires management to make judgements, estimates and assumptions that affect the reported amounts in the financial statements. Management continually evaluates its judgements and estimates in relation to assets, liabilities, contingent liabilities, revenue and expenses. Management bases its judgements, estimates and assumptions on historical experience and on other various factors, including expectations of future events, management believes to be reasonable under the circumstances. The resulting accounting judgements and estimates may differ to actual results.

(i)     Capitalisation of Software Development Costs

Distinguishing the research and development phases of a new customised software project and determining whether the recognition requirements for the capitalisation of development costs are met requires judgement. After capitalisation, management monitors whether the recognition requirements continue to be met and whether there are any indicators that capitalised costs may be impaired.

(ii)     Useful Lives of Depreciable Assets

Management reviews its estimate of the useful lives of depreciable assets at each reporting date, based on the expected utility of the assets. Uncertainties in these estimates relate to technical obsolescence that may change the utility of certain software and IT equipment.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 3    Summary of Accounting Policies (continued)

(iii)    Provisioning of Redeemable Prizes

Management estimates the provision for redeemable prizes, considering the most reliable evidence available at each reporting period.

Based on Global Poker Players' historical prizes redemption behaviour observed over a period of time, the Group determined that it is more appropriate to provision 60% of the period end balance of redeemable prizes. The Group will continue to monitor whether there are any indicators that the provision percentage should be revised.

For Chumba Casino and Luckyland Slots, the Group uses the whole amount of the period end balance for the provision.

(iv)    Revenue Recognition

Revenue is recognised over the retention period of the players in accordance with AASB 15: Revenue from Contracts with Customers, which will be re-evaluated from time to time to consider changes in player behaviour.

The Group accrues for unsettled player purchases on a monthly basis (purchases which have been completed but cash not yet settled to the Group from a payment processor). The same revenue deferral methodology using the retention period of players is applied to both settled and accrued gold coin purchases. Contract Liabilities are treated as a current liability.

For the year ended 30 June 2022, Management's parameter to determine average player retention period is the period when, on average, a cohort of acquired customers loses 85% or more of its players.

In accordance with AASB 108: Accounting Policies, Changes in Accounting Estimates and Errors, the Group has adjusted the amount prospectively by including it in profit or loss in the period of the change.

(v)    Income Taxes

A deferred tax asset is recognised for unused tax losses, tax credits and deductible temporary differences, to the extent that it is probable that future taxable profits will be available against which they can be utilised. Deferred tax assets are reviewed at each reporting date and are reduced to the extent that it is no longer probable that the related tax benefit will be realised. Recognition of deferred tax assets therefore involves judgement regarding timing and the level of future taxable income.

The Group is subject to income taxes in Australia and overseas jurisdictions where it operates. Significant judgement is required in determining the worldwide group provision for income taxes and carrying value of deferred tax assets. The Group undertakes transactions in the ordinary course of business where the income tax treatment may be uncertain and requires the exercise of judgment. As a result, the Group estimates its tax liabilities based on the Group's understanding of the tax law at the relevant time. These judgements and assumptions, which include matters such as the availability and timing of tax deductions and the application of the arm's length principle to related party transactions, are subject to risk and uncertainty. Changes in circumstances may alter expectations and affect the carrying amount of deferred tax assets/liabilities and income tax expense in future periods.

Where there is uncertainty over income tax treatments an assessment of each uncertain tax position is made as to whether it is probable that a taxation authority will accept the position. Where it is not possible, the effect of the uncertainty is reflected in determining the relevant taxable profit or loss, tax bases, unused tax losses and unused tax credits or tax rates.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 3    Summary of Accounting Policies (continued)

### o.   Foreign Currency Transactions and Balances

*Functional and presentation currency*
The consolidated financial statements are presented in Australian dollars (AUD), which is also the functional currency of the Group.

*Functional currency transactions and balances*
Foreign currency transactions are translated into functional currency of the respective Group entity, using the exchange rates prevailing at the dates of the transactions (spot exchange rate). Foreign exchange gains and losses resulting from the settlement of such transactions and from the re-measurement of monetary items at year end exchange rates are recognised in profit or loss.

Non-monetary items are not re-translated at year-end and are measured at historical cost (translated using the exchange rates at the date of transaction), except for non-monetary items measured at fair value which are translated using the exchange rates at the date when fair value was determined.

*Foreign operations*
In the Group's financial statements, all assets, liabilities and transactions of Group entities with a functional currency other than the Australian Dollar (AUD) are translated into AUD upon consolidation.

The functional currency of the other entities in the Group has remained unchanged during the reporting period.

On consolidation, assets and liabilities have been translated into AUD at the closing rate at the reporting date. Goodwill and fair value adjustments arising on the acquisition of a foreign entity have been treated as assets and liabilities of the foreign entity and translated into AUD at the closing rate. Income and expenses have been translated into AUD at the average rate over the reporting period. Exchange differences are charged and/or credited to other comprehensive income and recognised in the currency translation reserve in equity. On disposal of a foreign operation the cumulative translation differences recognised in equity are reclassified to profit or loss and recognised as part of the gain or loss on disposal.

### p.   Rounding of Amounts

The Company is a type of Company referred to in ASIC Corporations (Rounding in Financial/Directors' Reports) Instrument 2016/191 and therefore the amounts contained in this report and in the financial report have been rounded to the nearest $1,000, or in certain cases, to the nearest dollar.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 4    Revenue

The Group's revenue may be analysed as follows for each of the major product:

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Revenue from Continuing Operations** |  |  |
| Chumba Casino | 2,480,654 | 1,590,764 |
| Global Poker | 196,700 | 174,969 |
| Luckyland Slots | 779,378 | 458,335 |
| Fend Off | 113 | 536 |
| Facebook/Shared App | 303 | 153 |
| **Total revenue** | **3,457,148** | **2,224,757** |

The majority of the Group's customers are based in North America.

### 5    Other Income (Costs) and Expenses

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Finance Income** |  |  |
| Interest income | 89 | 51 |
|  | 89 | 51 |
| **Finance costs** |  |  |
| Interest expense | (1,479) | (802) |
| Bank and other financial intermediary charges | (148) | (169) |
|  | (1,627) | (971) |
| **Other financial Items** |  |  |
| Foreign currency realised gain/(loss) | 7,004 | (1,706) |
| Foreign currency unrealised gain/(loss) | 3,460 | (3,484) |
|  | 10,464 | (5,190) |
| **Other Income** |  |  |
| Office share and other income | 9 | 36 |
|  | 9 | 36 |
| **Marketing and advertisements** |  |  |
| Marketing Facebook | (113,966) | (50,503) |
| Marketing Non-Facebook | (121,293) | (30,443) |
|  | (235,259) | (80,946) |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

**6    Income Tax Expense**

| | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Current tax expense/(benefit)** | | |
| Current year | 153,641 | 67,030 |
| Adjustments for current tax of prior periods | (5,519) | 45 |
| **Deferred tax expense/(benefit)** | | |
| Current year including deferred tax expense/(benefit) on losses | 1,994 | (3,366) |
| Expected income tax expense/(benefit) | 150,116 | 63,709 |
| Adjustments for deferred tax of prior periods | (13) | (54) |
| Actual tax expense | **150,103** | **63,655** |
| | | |
| **Numerical reconciliation between tax expense to prima facie tax payable** | | |
| Profit/(loss) before tax | 604,104 | 358,342 |
| Income tax calculated at 30% (2021: 30%) | 181,231 | 107,503 |
| Increase/(decrease) in income tax expense/(benefit) due to: | | |
| Difference in overseas tax rates | 12,702 | 14,168 |
| Income Tax Refund * | (25,472) | (49,971) |
| Non-allowable items (permanent differences) | (12,826) | (8,036) |
| Subtotal | 155,635 | 63,664 |
| Adjustments for current and deferred tax of prior periods | (5,532) | (9) |
| Actual tax expense | **150,103** | **63,655** |

* Expected income tax refund from overseas jurisdictions.

Franking credits available for subsequent financial years based on a tax rate of 30% (2021: 30%) was $8.0m (2021: $0.6m).

The above amounts are calculated from the balance of the franking account as at the end of the reporting period, adjusted for franking credits and debits that will arise from the settlement of liabilities or receivables for income tax and dividends after the end of the year.

Net deferred tax assets have been brought to account as it is probable within the immediate future that tax profits will be available against which deductible temporary differences can be utilised.

Deferred tax assets on losses have been recognised.

**Movements in deferred tax assets/(liabilities) balances ($'000)**

| | Opening balance | Recognised in profit or loss | Closing balance |
|---|---|---|---|
| Unused tax losses | 38 | 0 | 38 |
| Accruals and provisions | 4,560 | 393 | 4,953 |
| Unrealised FX and other | 1,061 | (2,495) | (1,434) |
| Intangibles, prepayments and other | (40) | 551 | 511 |
| Net, DTA/(DTL) | **5,619** | **(1,551)** | **4,068** |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 7    Employee Benefits Expense

Expenses recognised for employee benefits are analysed below:

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| Wages and salaries | 55,946 | 37,138 |
| Social security payments | 6,422 | 3,857 |
| Termination payments | 380 | 807 |
| Other employee related benefits | 17,660 | 12,221 |
|  | 80,408 | 54,023 |

### 8    Cash and Cash Equivalents

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| Cash at bank | 267,601 | 208,480 |
| Funds with payment service providers | 101,870 | 89,758 |
|  | 369,471 | 298,238 |

The funds with payment service providers included above are immediately accessible and has the same liquidity as cash, therefore classified as cash and cash equivalents.

### 9    Trade and Other Receivables

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| CURRENT |  |  |
| Trade receivables | 23 | 14 |
| Accrued revenue | 38,951 | 15,753 |
| Other receivables |  |  |
| GST/VAT receivable | 6,407 | 3,006 |
| Other | 1 | 15 |
|  | 45,382 | 18,788 |

The trade receivables are current and have been fully paid or settled after balance sheet date.

### 10    Prepayments and Other Short-Term Assets

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| Prepayments | 10,178 | 6,671 |
| Restricted funds, bank guarantee and reserves | 20,655 | 13,861 |
| Deposits and bonds | 585 | 388 |
|  | 31,418 | 20,920 |

As of 30 June 2022, $3.1m and $0.2m are bank guarantees for leased premises and corporate cards respectively. There are $16.8m of restricted funds required from VGW's payment platform service providers.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 11   Controlled Entities

The subsidiaries listed below have share capital consisting solely of ordinary shares which are held directly by the parent entity. The assets of the subsidiaries have been consolidated on a line-by-line basis in the consolidated financial statements of the Group.

The proportion of ownership interests held equals the voting rights held by the Group.

| Name | Incorporation/ Registration Date | Country of Incorporation | Ownership Interest 2022 | 2021 |
|---|---|---|---|---|
| VGW Malta Holding Limited ^ | 19 Apr 2016 | Malta | 99.93% | 99.93% |
| VGW Holdings US Inc. | 29 Dec 2017 | United States | 100.00% | 100.00% |
| VGW Corporation Pty Limited | 4 Jan 2018 | Australia | 100.00% | 100.00% |
| Fendoff Pty Limited * | 17 Dec 2018 | Australia | 100.00% | 100.00% |
| Solstice Solutions Holdings Pty Limited | 1 Nov 2019 | Australia | 100.00% | 100.00% |
| | | | | |
| Wholly owned subsidiaries of VGW Malta Holding Limited: | | | | |
| VGW Malta Limited ^ | 9 Mar 2016 | Malta | 99.93% | 99.93% |
| VGW Games Limited | 10 Aug 2016 | Malta | 100.00% | 100.00% |
| Agence V Limited | 5 Oct 2016 | Malta | 99.93% | 99.93% |
| VGW Administration Malta Limited ^ | 7 Oct 2016 | Malta | 99.93% | 99.93% |
| VGW GP Limited ^ | 23 Nov 2016 | Malta | 99.93% | 99.93% |
| VGW Canada Inc. | 19 July 2019 | Canada | 100.00% | 100% |
| | | | | |
| Wholly owned subsidiaries of VGW Holdings US Inc. | | | | |
| VGW US, Inc. | 28 Aug 2017 | United States | 100.00% | 100.00% |
| VGW Luckyland, Inc. | 29 Dec 2017 | United States | 100.00% | 100.00% |

^   VGW Corporation Pty Limited holds the remaining 0.07%.
*   Fendoff Pty Limited ceased operating from 1 January 2022 as the Group consolidated its focus on its core products

### 12   Property, Plant and Equipment

Details of the Group's property, plant and equipment and their carrying amount are as follows:

| | Furniture & Fittings | Software | Office & Computer Equipment | Leasehold Improvements | Motor vehicle | TOTAL |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| Balance, 1 July 2021 | 75 | 43 | 3,137 | 2,592 | 425 | 6,272 |
| Additions | 73 | 8 | 1,363 | 828 | - | 2,272 |
| Disposals | (20) | - | (282) | - | - | (302) |
| Balance, 30 June 2022 | 128 | 51 | 4,218 | 3,420 | 425 | 8,242 |
| | | | | | | |
| **Accumulated Depreciation** | | | | | | |
| Balance, 1 July 2021 | (37) | (43) | (1,947) | (1,141) | (35) | (3,203) |
| Depreciation | (18) | (2) | (563) | (364) | (35) | (982) |
| Disposals | 1 | - | 255 | - | - | 256 |
| Balance, 30 June 2022 | (54) | (45) | (2,255) | (1,505) | (70) | (3,929) |
| Carrying amount, 30 June 2022 | 74 | 6 | 1,963 | 1,915 | 355 | 4,313 |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 12   Property, Plant and Equipment (continued)

| | Furniture & Fittings | Software | Office & Computer Equipment | Leasehold Improvements | Motor vehicle | TOTAL |
|---|---|---|---|---|---|---|
| _Cost_ | | | | | | |
| Balance, 1 July 2020 | 65 | 43 | 2,095 | 2,570 | - | 4,773 |
| Additions | 10 | - | 1,110 | 22 | 425 | 1,567 |
| Disposals | - | - | (68) | - | - | (68) |
| Balance, 30 June 2021 | 75 | 43 | 3,137 | 2,592 | 425 | 6,272 |
| | | | | | | |
| _Accumulated Depreciation_ | | | | | | |
| Balance, 1 July 2020 | (24) | (41) | (1,201) | (776) | - | (2,042) |
| Depreciation | (13) | (2) | (784) | (365) | (35) | (1,199) |
| Disposals | - | - | 38 | - | - | 38 |
| Balance, 30 June 2021 | (37) | (43) | (1,947) | (1,141) | (35) | (3,203) |
| Carrying amount, 30 June 2021 | 38 | - | 1,190 | 1,451 | 390 | 3,069 |

### 13   Leases

The Group leases office premises. Information about leases for which the Group is a lessee is presented below:

| | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Right-of-use** | | |
| Balance, 1 July | 9,677 | 4,870 |
| Additions | 7,220 | 7,362 |
| Depreciation expense | (2,398) | (2,555) |
| Balance, 30 June | 14,499 | 9,677 |
| **Lease Liabilities** | | |
| Not later than one year | 3,316 | 2,208 |
| Later than one year | 12,539 | 8,705 |
| **Amounts recognised in profit or loss** | | |
| Interest expense on lease liabilities | (1,479) | (802) |
| Rent expense relating to short-term leases | (1,553) | (1,162) |
| **Total cash outflow for the leases** | 3,553 | 2,970 |

Certain leases contain extension options exercisable by the Group from three to five years while certain leases have no option to renew.

At 30 June 2022, the Group was committed to short-term leases and the total commitment at that date was $0.2m.

The Group is committed to a new lease that has not commenced as of 30 June 2022. This lease will commence on 1 August 2022 with a lease term of five years.

The total of future lease payments in relation to lease liabilities as at 30 June 2022 are as follows:

| | 2022 $'000 |
|---|---|
| **Future lease payments in relation to lease Liabilities** | |
| Not later than one year | 3,316 |
| Later than one year and not later than five years | 11,783 |
| Later than five years | 756 |

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 14   Intangible Assets

|  | Software Development | Licenses | Domain name | Trademark | Total |
|---|---|---|---|---|---|
| *Cost* |  |  |  |  |  |
| Balance, 1 July 2021 | 17,297 | 219 | 144 | 25 | 17,685 |
| Foreign currency adjustments | (174) | - | 2 | (1) | (173) |
| Balance, 30 June 2022 | 17,123 | 219 | 146 | 24 | 17,512 |
|  |  |  |  |  |  |
| *Accumulated Amortisation* |  |  |  |  |  |
| Balance, 1 July 2021 | (14,405) | (71) | (127) | - | (14,603) |
| Amortisation | (1,693) | (30) | (13) | - | (1,736) |
| Balance, 30 June 2022 | (16,098) | (101) | (140) | - | (16,339) |
| Carrying amount, 30 June 2022 | 1,025 | 118 | 6 | 24 | 1,173 |

|  | Software Development | Licenses | Domain name | Trademark | Total |
|---|---|---|---|---|---|
| *Cost* |  |  |  |  |  |
| Balance, 1 July 2020 | 17,442 | 219 | 148 | 26 | 17,835 |
| Foreign currency adjustments | (145) | - | (4) | (1) | (150) |
| Balance, 30 June 2021 | 17,297 | 219 | 144 | 25 | 17,685 |
|  |  |  |  |  |  |
| *Accumulated Amortisation* |  |  |  |  |  |
| Balance, 1 July 2020 | (11,458) | (41) | (31) | - | (11,530) |
| Amortisation | (2,947) | (30) | (96) | - | (3,073) |
| Balance, 30 June 2021 | (14,405) | (71) | (127) | - | (14,603) |
| Carrying amount, 30 June 2021 | 2,892 | 148 | 17 | 25 | 3,082 |

### 15   Trade and Other Payables

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **CURRENT** |  |  |
| Trade payables | 38,418 | 17,608 |
| Dividends payable | - | 73,280 |
| Other payables and accruals | 14,978 | 5,336 |
|  | 53,396 | 96,224 |

All amounts are short-term. The carrying value of trade payables, other payables and accruals are considered to be a reasonable approximation of fair value.

### 16   Contract Liability

Revenue from player purchases is deferred over the player's retention period in accordance with AASB 15: Revenue from Contracts with Customers. The Contract Liability represents player purchases that are yet to be recognised as revenue over the remaining retention life of players. The balance as of 30 June 2022 is $131.9 million (2021: $75.4 million)

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 17   Provisions

| | Sweepstakes | Leave Entitlements | Short-Term Incentive | Make Good | TOTAL |
|---|---|---|---|---|---|
| Balance, 1 July 2021 | 32,015 | 3,557 | 7,513 | 641 | 43,726 |
| Additional provisions | 50,272 | 3,489 | 13,383 | 834 | 67,978 |
| Reversals | (35,322) | (1,691) | (8,462) | - | (45,475) |
| Balance, 30 June 2022 | 46,965 | 5,355 | 12,434 | 1,475 | 66,229 |

The provision for prizes liability represents prizes redeemable for players which are active within a specified period. Under the Sweepstakes rules, redeemable prizes of players not active within the specified period expire.

Global Poker redeemable prizes are provisioned on the basis of 60% of the period end balance, which amounts to $7.9 million as at 30 June 2022. The 60% provision is deemed appropriate based on historical behaviour of players and is regularly assessed.

Included in the total leave entitlements provision is $1.0 million in long service leave and is non-current. All other provisions are current.

### 18   Fair Value Measurement of Financial Instruments

**Fair value measurement of financial instruments**

The following table shows the carrying amount and fair values of financial assets and financial liabilities, including their levels in the fair value hierarchy. It does not include fair value information for financial assets and financial liabilities not measured at fair value if the carrying amount is a reasonable approximation of fair value.

| 30 June 2022 | Note | Fair Value | Carrying amount Amortised Cost | Other Financial Liabilities |
|---|---|---|---|---|
| *Financial assets not measured at fair value* | | | | |
| Cash and cash equivalents | 8 | - | 369,471 | - |
| Trade and other receivables | 9 | - | 45,382 | - |
| Financial assets | | - | 582 | - |
| | | - | 415,435 | - |
| *Financial assets measured at fair value* | | | | |
| Financial assets | | 388 | - | - |
| | | 388 | - | - |
| *Financial liabilities not measured at fair value* | | | | |
| Trade and other payables | 15 | - | 53,396 | - |
| Dividends payable | | - | - | - |
| | | - | 53,396 | - |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 18   Fair Value Measurement of Financial Instruments (continued)

| 30 June 2021 | Note | Fair Value | Carrying amount Amortised Cost | Other Financial Liabilities |
|---|---|---|---|---|
| *Financial assets not measured at fair value* | | | | |
| Cash and cash equivalents | 8 | - | 298,238 | - |
| Trade and other receivables | 9 | - | 18,788 | - |
| Financial assets | | - | 532 | |
| | | - | 317,558 | - |
| *Financial liabilities not measured at fair value* | | | | |
| Trade and other payables | 15 | - | 22,944 | - |
| Dividends payable | | - | 73,280 | - |
| | | - | 96,224 | - |

There were no transfers between Level 1 and level 2 during the period. There were also no changes during the period in the valuation techniques used by the Group to determine Level 2 fair values.

### 19   Issued Capital

| | Consolidated entity | | | |
|---|---|---|---|---|
| | 2022 Shares | 2021 Shares | 2022 $'000 | 2021 $'000 |
| Fully paid ordinary shares, net of share issue cost | 620,614,844 | 614,667,375 | 37,636 | 34,283 |

| Movements in ordinary share capital | Number | Value ($'000) |
|---|---|---|
| Opening balance, 1 July 2020, net of share issue cost | 579,663,639 | 25,438 |
| Conversion options into ordinary share (b) | 33,837,070 | 8,033 |
| Issuance of loan funded shares (a) | 833,333 | - |
| Issuance of new shares | 333,333 | - |
| Settlement of loan funded shares (Note 21 a) | - | 812 |
| Closing balance, 30 June 2021 | 614,667,375 | 34,283 |
| | | |
| Opening balance, 1 July 2021, net of share issue cost | 614,667,375 | 34,283 |
| Conversion options into ordinary share (b) | 5,947,469 | 2,153 |
| Settlement of loan funded shares (Note 21 a) | - | 1,200 |
| Closing balance, 30 June 2022 | 620,614,844 | 37,636 |

a) On 18 June 2020 and 24 July 2020, the company provided a new tranche of loan funded shares to number of senior employees. Refer to note 21(a).

b) The options that were converted into ordinary shares in FY 2022 were previously provided under the LTIP options.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

**20   Related Party Transactions**

The Group's main related parties are as follows:

**a.   Parent entity and controlled entities**

VGW Holdings Limited ("the parent") exercises control over its subsidiaries: VGW Malta Holding Ltd., VGW Malta Ltd., VGW Administration Malta Ltd., VGW Games Ltd., Agence V Ltd., VGW GP Ltd., VGW Holdings US Inc., VGW US, Inc., VGW Luckyland Inc., Fendoff Pty Ltd., VGW Canada Inc., VGW Corporation Pty Limited and Solstice Solutions Holdings Pty Ltd. The parent and the subsidiaries are collectively referred to as the "consolidated entity" and are constituent parts of these consolidated financial statements. Accordingly, the subsidiaries are considered as related parties in the separate financial statements of the parent entity rather than in the consolidated financial statements.

**b.   Key management personnel**

Any person(s) having authority and responsibility for planning, directing and controlling the activities of the entity, directly or indirectly, including any director (whether executive or otherwise) of that entity is considered key management personnel.

Key management personnel remuneration includes the following:

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| Short term employee benefits | 10,680 | 6,404 |
| Post-employment benefits | 29 | 2 |
| Other long-term employee benefits | 275 | 90 |
| Share based payments | 4,675 | 665 |
| **Total key management personnel remuneration** | **15,659** | **7,161** |

In FY 2022, dividends of $279.3 million were paid to key management personnel (2021: $142.2 million).

**c.   Transactions with related parties**

The following transactions occurred with related parties:

|  | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Payment for goods and services:** |  |  |
| Purchases of services from entities controlled by key management personnel | 522 | 61 |
| **Total payment for goods and services** | **522** | **61** |

The group acquired the following goods and services from entities that are controlled by members of the group's key management personnel:

- Corporate event services ($0.2 million)
- Aviation transport services ($0.3 million)

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 20   Related Party Transactions (continued)

**d.   Outstanding balances arising from sales/purchases of goods and services**

The following balances are outstanding at the end of the reporting period in relation to transactions with related parties:

|  | 2022 | 2021 |
|---|---|---|
|  | $'000 | $'000 |
| **Current payables (purchases of goods and services)** |  |  |
| Entities controlled by key management personnel | 300 | - |
| Total current payables (purchases of goods and services) | 300 | - |

**e.   Terms and conditions**

All transactions were made on arm's length commercial terms and conditions and at market rates.

### 21   Share-based payments

**a.   Loan Funded Share arrangements**

For loan funded shares issued in 2020 and 2021, shares are issued at allocation date, paid for via non-recourse loans provided by the Company. Loans will be repaid to the Company when the shares are sold or at the expiry of the loan term. Shares have voting and dividend participation rights but are not transferable until any applicable loans are repaid. Loans may be repaid pro-rata to each underlying share. Loan funded shares were accounted for as a share-based payment by recognising an expense and a credit to equity. Loan repayments are recorded as a credit in equity.

The fair value of the loan funded shares has been measured using the Black-Scholes method. The inputs used in the measurement of the fair values at grant date of the shares were as follows:

| Grant Date | Number of Shares | Fair value | Share Price | Exercise Price |
|---|---|---|---|---|
| 18 June 2020 | 15,311,624 | 0.03 | 0.25 | 0.25 |
| 24 July 2020 | 833,333 | 0.03 | 0.25 | 0.25 |

$1.2 million of loans, in respect of loan funded shares, were repaid during the year. This has been recognised directly in equity.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 21   Share-based payments (continued)

**b.   Share Options**

In January 2017, VGW established a Long-Term Incentive Plan (LTIP) which is part of VGW's reward strategy in support of the achievement of the Company's business strategy. Tranche 4(a) was granted on 31 January 2019 and vested one year after that date. Tranche 2020 July was granted and vested on 24 July 2020. Tranche 6 was granted on 1 July 2019 and vested on 31 January 2023. Tranches 7, 8 and 9 were granted on 31 May 2021 and have vesting dates of 1, 2 and 3 years after the grant date respectively. The key terms and conditions related to the options issued are disclosed below. The fair value of the share options has been measured using the Black-Scholes method. The inputs used in the measurement of the fair values at grant date of the options were as follows:

| LTIP | Grant Date | Number of Options | Contractual Life of Options | Fair Value | Share Price | Exercise Price | Exercisable Options |
|------|-----------|-------------------|-----------------------------|-----------|-------------|----------------|---------------------|
| Tranche 4 (a) | 31 Jan 2019 | 210,000 | 4 years | 0.0800 | 0.25 | 0.20 | 210,000 |
| Tranche July 2020 | 24 Jul 2020 | 580,606 | 3 years | 0.0300 | 0.25 | 0.25 | 580,606 |
| Tranche 6 | 1 Jul 2019 | 133,333 | 5 years | 0.0357 | 0.25 | 0.40 | - |
| Tranche 7 | 31 May 2021 | 2,417,001 | 3 years | 1.2600 | 2.98 | 0.85 | 2,417,001 |
| Tranche 8 | 31 May 2021 | 3,390,750 | 3 years | 1.2600 | 2.98 | 0.85 | - |
| Tranche 9 | 31 May 2021 | 3,390,750 | 3 years | 1.2600 | 2.98 | 0.85 | - |

### 22   Earnings per Share

|  | 2022 | 2021 |
|--|------|------|
|  | $'000 | $'000 |
| **Profit after income tax attributable to the owners of VGW Holdings Limited** | **454,001** | **294,687** |
|  | **Number of shares** | **Number of shares** |
| Weighted average number of shares used in calculating basic earnings per share | 616,448,465 | 601,547,381 |
| Weighted average number of shares used in calculating diluted earnings per share | 623,659,625 | 609,375,438 |
|  | **Cents** | **Cents** |
| Basic income per share | 73.65 | 48.99 |
| Diluted income per share | 72.81 | 48.36 |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 23   Parent entity information

Set out below is the supplementary information about the parent entity.

| | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Statement of profit or loss and other comprehensive income** | | |
| Income for the year | 468,632 | 282,410 |
| Total comprehensive income | 468,632 | 282,410 |
| | | |
| **Statement of financial position** | | |
| Total current assets | 171,290 | 138,117 |
| Total assets | 226,774 | 152,497 |
| Total current liabilities | 43,119 | 112,787 |
| Total liabilities | 55,430 | 122,331 |
| Equity | 171,344 | 30,166 |

The accounting policies of the parent entity are consistent with those of the consolidated entity, as disclosed in Note 1.

### 24   Cash Flow Information

**Reconciliation of Cash Flow from Operations with Profit after Income Tax**

| | 2022 $'000 | 2021 $'000 |
|---|---|---|
| **Profit after income tax** | **454,001** | **294,687** |
| **Non-cash flows in profit:** | | |
| Amortisation | 1,889 | 3,166 |
| Depreciation | 4,088 | 3,668 |
| Share-based payments expense | 8,171 | 1,297 |
| Loss on disposal of assets | 4 | 29 |
| Interest on lease liabilities | 1,479 | 802 |
| Other income | (7) | - |
| Net foreign currency exchange differences | (10,445) | 5,244 |
| **Changes in assets and liabilities, net of the effects of purchase and disposal of subsidiaries:** | | |
| (Increase)/decrease in trade and other receivables | (26,594) | 678 |
| (Increase)/decrease in prepayments | (3,507) | (3,076) |
| (Increase)/decrease in bonds and deposits/reserves and restricted funds | (6,991) | (7,400) |
| (Increase)/decrease in deferred tax assets | 1,551 | (3,731) |
| Increase/(decrease) in trade payables and accrued expenses | 30,482 | 10,647 |
| Increase/(decrease) in provisions | 21,670 | 14,636 |
| Increase/(decrease) in current tax liabilities | (40,107) | 14,535 |
| Increase/(decrease) in deferred revenue | 56,530 | 34,491 |
| **Cash flow from operations** | **492,214** | **369,673** |

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 25   Auditors Remuneration

Fees paid or payable to the Company's auditors are as follows:

|  | 2022 | 2021 |
| --- | --- | --- |
|  | $'000 | $'000 |
| **Audit Services** |  |  |
| Audit of financial statements – Grant Thornton Australia | 189 | 151 |
| Audit of financial statements – Overseas Grant Thornton network firms | 66 | 65 |
| Total audit services remuneration | 255 | 216 |
| **Non-Audit Services** |  |  |
| Tax compliance and tax advisory services – Grant Thornton Australia | 35 | 164 |
| Tax compliance and tax advisory services – Overseas Grant Thornton network firms | 274 | 240 |
| Total non-audit services remuneration | 309 | 404 |
| **Total auditor's remuneration** | 564 | 620 |

### 26   Events After the Reporting Period

1. On 28 July 2022, VGW issued 41.0 million loan funded shares to the Directors and some executives as part of its employee incentive program at $4.01 per share.
2. A lease agreement was signed in August 2022 for new office premises in Perth. The lease commences on 1 August 2022.
3. On 30 August 2022, the Company paid a twenty-cent per ordinary share partially franked dividend, totaling $132.7 million.
4. In September 2022 VGW entered into an agreement in principle to settle a putative class action in the state of Kentucky for US$11.75 million.

### 27   Contingent Liabilities

There are no contingent liabilities or assets that have been incurred by the Group in relation to FY 2022 (2021: Nil).

### 28   Dividends

During the financial year ended 30 June 2022, the Company paid the following partially franked dividends (2021: $284.6 million):

| Date | Dividend per Ordinary Share | Total Dividend |
| --- | --- | --- |
| 1 Oct 2021 | $0.20 | $122.9m |
| 20 Dec 2021 | $0.17 | $104.9m |
| 1 Mar 2022 | $0.18 | $111.2m |

On 2 July 2021, the Company paid a twelve-cent per ordinary share partially franked dividend, totalling $73.8 million. This dividend was declared on 28 June 2021.

The franking percentage of the dividends paid in FY2022 were disclosed on the distribution statements to shareholders.

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

## VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS AS AT 30 JUNE 2022

### 29   Equity - reserves

**a.   Share-based payment reserve**

The share-based payments reserve is used to recognise the grant date fair value of options issued to employees. Any amounts recognised in this reserve remain in the reserve, no amounts are transferred to issued capital on exercise of the options, see note 3(h) for the accounting policy for share-based payments.

**b.   Foreign currency reserve**

Exchange differences arising on translation of the foreign controlled entity are recognised in other comprehensive income as described in note 5 and accumulated in a separate reserve within equity. The cumulative amount is reclassified to profit or loss when the net investment is disposed of.

**c.   Financial assets at fair value through other comprehensive income reserve**

The reserve is used to recognise increments and decrements in the fair value of financial assets at fair value through other comprehensive income.

The listed ordinary shares have been valued based on their quoted market prices in active markets.

# VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES

## Directors' Declaration

In the directors' opinion:

   (a)  the financial statements and Notes set out on pages 10 to 36, are in accordance with the Corporations Act 2001, including:

        (i)   giving a true and fair view of the financial position of the Company's and the Group's financial position as at 30 June 2022 and of their performance for the financial year ended on that date;

        (ii)  complying with Australian Accounting Standards - Simplified Disclosures (including the Australian Accounting Interpretations) and the Corporations Regulations 2001; and

   (b)  there are reasonable grounds to believe that the Company and the Group Entities identified in Note 11 will be able to pay its debts as and when they become due and payable.

Signed in accordance with a resolution of the directors:

Laurence ESCALANTE
Director

4 October 2022

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

 Grant Thornton

**Grant Thornton Audit Pty Ltd**
Level 17
383 Kent Street
Sydney NSW 2000
Locked Bag Q800
Queen Victoria Building NSW
1230

T +61 2 8297 2400

# Independent Auditor's Report

## To the Members of VGW Holdings Limited

### Report on the audit of the financial report

#### Opinion

We have audited the financial report of VGW Holdings Limited (the Company) and its subsidiaries (the Group), which comprises the consolidated statement of financial position as at 30 June 2022, the consolidated statement of profit or loss and other comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the year then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies, and the Directors' declaration.

In our opinion, the accompanying financial report of the Group is in accordance with the *Corporations Act 2001*, including:

a   giving a true and fair view of the Group's financial position as at 30 June 2022 and of its performance for the year ended on that date; and

b   complying with Australian Accounting Standards *AASB 1060 General Purpose Financial Statements - Simplified Disclosures for For-Profit and Not-for-Profit Tier 2 Entities* and the *Corporations Regulations 2001*.

#### Basis for opinion

We conducted our audit in accordance with Australian Auditing Standards. Our responsibilities under those standards are further described in the *Auditor's Responsibilities for the Audit of the Financial Report* section of our report. We are independent of the Group in accordance with the *Corporations Act 2001* and the ethical requirements of the Accounting Professional and Ethical Standards Board's APES 110 *Code of Ethics for Professional Accountants (including Independence Standards)* (the Code) that are relevant to our audit of the financial report in Australia. We have also fulfilled our other ethical responsibilities in accordance with the Code.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion

www.grantthornton.com.au
ACN-130 913 594

Grant Thornton Audit Pty Ltd ACN 130 913 594 a subsidiary or related entity of Grant Thornton Australia Limited ABN 41 127 556 389 ACN 127 556 389.
'Grant Thornton' refers to the brand under which the Grant Thornton member firms provide assurance, tax and advisory services to their clients and/or
refers to one or more member firms, as the context requires. Grant Thornton Australia Limited is a member firm of Grant Thornton International Ltd (GTIL).
GTIL and the member firms are not a worldwide partnership. GTIL and each member firm is a separate legal entity. Services are delivered by the member
firms. GTIL does not provide services to clients. GTIL and its member firms are not agents of, and do not obligate one another and are not liable for one
another's acts or omissions. In the Australian context only, the use of the term 'Grant Thornton' may refer to Grant Thornton Australia Limited ABN 41 127
556 389 ACN 127 556 389 and its Australian subsidiaries and related entities. Liability limited by a scheme approved under Professional Standards
Legislation.

**Information other than the financial report and auditor's report thereon**

The Directors are responsible for the other information. The other information comprises the information included in the Group's annual report for the year ended 30 June 2022, but does not include the financial report and our auditor's report thereon.

Our opinion on the financial report does not cover the other information and accordingly we do not express any form of assurance conclusion thereon.

In connection with our audit of the financial report, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial report or our knowledge obtained in the audit or otherwise appears to be materially misstated.

If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

**Responsibilities of the Directors' for the financial report**

The Directors of the Company are responsible for the preparation of the financial report that gives a true and fair view in accordance with Australian Accounting Standard – *AASB 1060 General Purpose Financial Statements - Simplified Disclosures for For-Profit and Not-for-Profit Tier 2 Entities* and the *Corporations Act 2001*. The Directors' responsibility also includes such internal control as the Directors determine is necessary to enable the preparation of the financial report that gives a true and fair view and is free from material misstatement, whether due to fraud or error.

In preparing the financial report, the Directors are responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Directors either intend to liquidate the Group or to cease operations, or have no realistic alternative but to do so.

**Auditor's responsibilities for the audit of the financial report**

Our objectives are to obtain reasonable assurance about whether the financial report as a whole is free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with the Australian Auditing Standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of this financial report.

A further description of our responsibilities for the audit of the financial report is located at the Auditing and Assurance Standards Board website at: http://www.auasb.gov.au/auditors_responsibilities/ar3.pdf. This description forms part of our auditor's report.

*Grant Thornton*

Grant Thornton Audit Pty Ltd
Chartered Accountants

*RJ Isbell*

R J Isbell
Partner – Audit & Assurance

Sydney, 4 October 2022

Date Filed 10/30/2023 9:29 AM
Superior Court - Suffolk
Docket Number

# EXHIBIT B

VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES | ACN 147 193 511

# VGW
# MODERN SLAVERY
# STATEMENT
# 2021





## CONTENTS

INTRODUCTION ................................................................................................................. 2

STRUCTURE AND OPERATIONS ...................................................................................... 3

SUPPLY CHAINS ................................................................................................................. 4

RISKS OF MODERN SLAVERY PRACTICES ..................................................................... 5

ACTIONS TO ASSESS AND ADDRESS MODERN SLAVERY RISKS ................................ 6

ASSESSMENT OF EFFECTIVENESS ................................................................................. 7

CONSULTATION ................................................................................................................. 8

OTHER RELEVANT INFORMATION .................................................................................... 9

APPROVAL ........................................................................................................................ 10



## INTRODUCTION

This modern slavery statement (**Statement**) is the second statement developed in accordance with the requirements of the Australian Modern Slavery Act 2018 (Cth) (**Act**). It follows on from the first statement which was approved on 24 March 2021 and published on the Australian Government's Online Register for Modern Slavery Statements on 23 April 2021. It outlines further action(s) taken by VGW Holdings Limited (ACN 147 193 511) (**VGW** or **we**) and its wholly owned and controlled entities (referred to collectively as **VGW Group**) to identify, assess and reduce the risk of modern slavery practices in its operations and supply chains during the year ending 30 June 2021.

The VGW Group is committed to identifying and eradicating any modern slavery practices in its operations and supply chains. This Statement, and future statements, will reflect VGW's continuous improvement in its approach to addressing modern slavery risks.



## STRUCTURE AND OPERATIONS

VGW is an Australian public company which operates from and has its registered office in Perth, Western Australia. VGW has subsidiaries in Australia, the United States of America (**US**), Canada and Malta. As at 30 June 2021, VGW Group employed approximately 745 employees.

The VGW Group is an online social games provider and its key operating activities comprise:

**Direct employment of personnel:**
The VGW Group employs personnel such as engineers, developers, designers, data analysts, mathematicians, marketing specialists, managers, compliance officers, human resources advisors, accountants and lawyers across its offices. The recruitment process of VGW Group personnel is predominantly conducted from VGW's office in Perth, Western Australia.

**Provision and delivery of online services:**
The VGW Group offers online social games services and promotions to customers located in certain territories in the US and Canada.

**Research and development:**
Personnel within the VGW Group engage in research and development to produce new offerings and games as well as improve on existing offerings.



## SUPPLY CHAINS

As an online social games provider, the VGW Group's supply chains consist of the following key categories:

**Consulting:**
Consulting services supplied to the VGW Group include product development and brand and design consultancy services.

**Customer Service:**
Customer services supplied to the VGW Group include responding to customer queries, addressing complaints, troubleshooting issues and complying with anti-fraud and anti-money laundering requirements.

**Finance and tax:**
Financial and tax services supplied to the VGW Group include payroll, auditing and advisory services.

**Legal:**
Legal services supplied to the VGW Group include legal advisory services relating to employment law, intellectual property, marketing and promotions, and branding.

**Marketing:**
Marketing services supplied to the VGW Group include promotional and advertising services.

**Payments:**
Payments services supplied to the VGW Group include the processing of payments and other payment related services.

**Technology:**
The VGW Group procures software to support its operations as well as hardware such as laptops, monitors, computer accessories, conferencing equipment and printers/copiers.

In addition to the above key categories, services such as catering, cleaning, utilities, travel, and production of branded merchandise are also included in the VGW Group's supply chains.



## RISKS OF MODERN SLAVERY PRACTICES

### Direct Operations

Given the industry in which the VGW Group operates (online social games) and the location of its offices in low-risk jurisdictions (Australia, US, Canada and Malta), our assessment of the risk of modern slavery practices within the VGW Group's direct business operations is low. VGW Group entities are either directly responsible for their own recruitment of personnel and management of office facilities or obtain support for these functions from VGW.

The engagement of independent contractors in the Philippines to deliver customer support services and in Romania to work on product development was identified as a potential issue as these are higher risk jurisdictions based on information sourced via the Global Slavery Index.

The risk in respect of contractors in the Philippines is mitigated significantly because they are engaged by VGW Group entities rather than through a third party. VGW is therefore able to directly monitor the arrangements to ensure that its contractors received fair service fees and are not subject to modern slavery practices.

VGW Group contractors in Romania are engaged by an external third party based in Romania. There is no indication that Romanian contractors are subject to modern slavery practices, but VGW will undertake detailed due diligence in relation to the third party provider to further assure itself that such practices do not exist. This will be reported in future statements.

### Supply Chains

We are of the view that the VGW Group's supply chains are predominantly low risk, taking into account the industry in which it operates and the nature of the goods and services it procures. However, the potential for modern slavery to exist is recognised, particularly in the VGW Group's extended supply chains and higher risk categories or locations.

The following procurement categories have been identified as having a higher risk of modern slavery:

- Technology infrastructure and hardware
- Facilities service providers (e.g. cleaning and premises maintenance)
- Merchandise supply chains (e.g. production of branded clothing and other items)



## ACTIONS TO ASSESS AND ADDRESS MODERN SLAVERY RISKS

VGW's commitment to identifying and eradicating modern slavery in its operations and supply chains is reflected in the following initiatives that had been implemented across the VGW Group as at 30 June 2021:

### Group-wide Policies

- **Anti-Bribery and Corruption Policy:**
  VGW Group's Anti-Bribery and Corruption Policy was adopted on 30 September 2020, adding to VGW Group's suite of policies that guide the behaviour of its personnel, in particular, the curtailing of abuse of position of trust or power.
- **Anti-Financial Crime Policy and Procedure:**
  VGW Group's Anti-Financial Crime Policy and accompanying Procedure also provides guidance to its personnel concerning the prevention of financial crimes that includes money laundering, funding of terrorism, fraud and bribery and corruption.

### Recruitment and terms of employment contracts

- As highlighted in the VGW Group's first modern slavery statement, the majority of recruitment for the VGW Group is conducted by personnel located in Perth. VGW's in-house legal team is involved with the preparation and review of recruitment agreements and employment contracts.
- This further substantiates VGW's position to be able to ensure that the recruitment process is conducted in an ethical and transparent manner and that employment contracts contain fair and just terms in relation to wages, working hours and other working conditions.
- This aids in curbing any direct instances of modern slavery practices within the VGW Group's operations.

**VGW**

## ASSESSMENT OF EFFECTIVENESS

VGW is in the process of putting in place a formal modern slavery framework that will enable it to more comprehensively assess and mitigate the risks of modern slavery in the VGW Group's operations and supply chains. We will continue to make further improvements to the VGW Group's processes and procedures, including those described in the **OTHER RELEVANT INFORMATION** section of this Statement.

As VGW's modern slavery framework becomes more sophisticated, we plan to develop a program of monitoring and auditing, including reviewing targeted suppliers. We aspire to continuously improve our approach to modern slavery risks.



## CONSULTATION

Global policies and procedures, including those relating to modern slavery, are implemented across the entire VGW Group. As the entities within the VGW Group operate in the same industry and share common directors, they adhere to and observe common policies and processes, including those described in this Statement.



## OTHER RELEVANT INFORMATION

As part of VGW's commitment to identify and eradicate modern slavery practices in its operations and supply chains, the following actions have commenced and will be reported in future modern slavery statements. These include:

**Modern Slavery Due Diligence Questionnaire (Questionnaire)**

- The Questionnaire:
  - will assist the VGW Group to identify and assess the risk of modern slavery practices occurring in its supply chains
  - comprises a set of questions contained within OneTrust as a separate modern slavery component that suppliers will be asked to complete and
  - will be rolled out in stages, starting with high value and perceived high risk suppliers.

**Modern slavery clauses in contracts**

- The VGW Group has prepared modern slavery specific clauses that will be /have been introduced in contracts with suppliers (where possible) containing representations and obligations in relation to:
  - the supplier's commitment to preventing modern slavery practices and
  - co-operating with VGW by providing information required to assess modern slavery risks in their operations and supply chains.

**Modern Slavery Policy**

- VGW Group's Modern Slavery Policy has been implemented across the VGW Group. The policy:
  - solidifies VGW Group's commitment to identifying and addressing risks of modern slavery occurring in its operations and supply chains and
  - sets out the standards of behaviour expected of VGW Group personnel in identifying and addressing modern slavery risks.

**Implementation of Contracts Management System**

- VGW has implemented a contracts management system that will act as an efficient mechanism to track all VGW Group vendors/suppliers.
- The contracts management system will complement the OneTrust system and together both systems will equip VGW with ability to efficiently analyse and monitor modern slavery risks within the VGW Group's supply chains.

**COVID-19 response**

VGW acknowledges that COVID-19 may have an impact on modern slavery risks within VGW Group's supply chains. We will strive to ensure that any COVID-19 related modern slavery risks are identified and addressed accordingly.

## APPROVAL

This Statement was approved by the board of directors of VGW Holdings Limited on 21 December 2021.

**Laurence Escalante**
Director
VGW Holdings Limited

21 December 2021

3

ML

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF SUFFOLK
THE SUPERIOR COURT

FAIR GAMING ADVOCATES MA LLC,

Plaintiff,

v.

VGW HOLDINGS LIMITED, VGW MALTA
LIMITED, VGW LUCKYLAND INC., and
VGW US, INC.,

Defendants.

Civil Action No. 2384CV02451

## DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL

PLEASE TAKE NOTE that, on this date, VGW Holdings Limited, VGW Malta Limited,

VGW Luckyland Inc., and VGW US, Inc., through its undersigned counsel, filed a Notice of

Removal with the Clerk of the United States District Court for the District of Massachusetts,

Eastern Division, thereby removing this action.   A copy of the Notice of Removal is attached

hereto as Exhibit 1.

This 28th day of November 2023.

Respectfully Submitted,

*/s/ Matthew D. LaBrie*
Matthew D. LaBrie (BBO No. 693698)
mlabrie@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite #2000
Boston, MA 02116
T:     +1 617 880 1800
F:     +1 617 880 1801

*Counsel for VGW Holdings Limited, VGW
Malta Limited, VGW Luckyland, Inc., and VGW
US, Inc.*

I HEREBY ATTEST AND CERTIFY ON
November 30, 2023 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:
Asst. Clerk

- 1 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of November 2023, the foregoing document was served on counsel of record for Plaintiff Fair Gaming Advocates MA LLC, listed below, via email and certified mail:

Quinn Heath, Esq.
476 Windsor Street #1
Cambridge, MA 02141
Quinn@MensingGroup.com

*Counsel for Fair Gaming Advocates MA LLC*

/s/ Matthew D. LaBrie
Matthew D. LaBrie

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| **FAIR GAMING ADVOCATES MA LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.** 23-CV-12878 |
| **VGW HOLDINGS LIMITED, VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW US, INC.,** | |
| **Defendants.** | |

## DEFENDANTS' NOTICE OF REMOVAL

Defendants VGW Holdings Limited ("VGW Holdings"), VGW Malta Limited ("VGW Malta"), VGW Luckyland, Inc. ("VGW Luckyland") and VGW US, Inc. ("VGW US") (collectively, "Defendants"), by counsel pursuant to 28 U.S.C. §§ 1441 and 1446, hereby specially appear for the purpose of this removal and, preserving all defenses, remove this civil action from the Suffolk County Superior Court of the Commonwealth of Massachusetts to the United States District Court for the District of Massachusetts.

In support of this Notice of Removal, Defendants state as follows:

### I.   OVERVIEW

1.     On or about October 30, 2023, Plaintiff Fair Gaming Advocates MA LLC ("Plaintiff") filed suit against Defendants in the Superior Court of Suffolk County, Massachusetts, Case No. 2384CV02451. Defendants specialize in the development and publication of online casino-themed social games. *See* Declaration of Michael Thunder ("Thunder Decl.") ¶ 3. Plaintiff alleges that Defendants' games, including *Luckyland Slots* and *Chumba Casino*, are unlawful gambling in Massachusetts. Ex. A, Compl. ¶¶ 124–38. Plaintiff asserts a claim under M.G.L. ch.

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG Document 5 Filed 12/13/23 Page 100 of 108
Superior Court - Suffolk
Docket Number 2384CV02451 Case 1:23-cv-12878 Document 1 Filed 11/28/23 Page 2 of 10

137 § 1 to recover for *itself*—and *only itself*—treble the amount spent by *all Massachusetts residents* to purchase virtual coins in Defendants' games "more than three months and up to a year" preceding the filing of Plaintiff's lawsuit on October 30, 2023. *Id.*, Compl. ¶ 127.

2.      Pursuant to 28 U.S.C. § 1446(a), attached hereto as Exhibit A is a copy of all process, pleadings, and orders filed in the state court case to date. Defendants have not been served with the summons and complaint, nor have Defendants filed any responsive pleadings.

3.      This removal is timely because Defendants have filed and served this notice of removal within 30 days of their receipt of the complaint, despite none of the Defendants having been served. *See* 28 U.S.C. § 1446(b) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."). The basis for removal is diversity jurisdiction under 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Notwithstanding that they have yet to be served, Defendants specially appear solely for the purpose of removing the state court action to this Court and reserve all defenses, including the defenses of insufficient service of process and lack of personal jurisdiction.

5.      Pursuant to Local Rule 81.1, Defendants will file certified or attested copies of all records and proceedings and docket entries in the state court with this Court within 28 days of the filing of this Notice.

6.      A copy of this Notice of Removal will be filed with the Suffolk County Superior Court, and a copy will be provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG   Document 5   Filed 12/13/23   Page 101 of 108
Superior Court - Suffolk
Docket Number 2384CV02451      Case 1:23-cv-12878   Document 1   Filed 11/28/23   Page 3 of 10

## II.   JURISDICTION AND VENUE

7.      By removing the state court action to this Court, Defendants do not consent to this

Court's exercise of personal jurisdiction over them in this litigation and reserve the right to move

for dismissal on that and any other grounds available to them. *See Garden Homes, Inc. v. Mason*,

238 F.2d 651, 653 (1st Cir. 1956) (defense of insufficient service of process and lack of personal

jurisdiction not waived upon removal); *cf. Egan v. Tenet Health Care*, 193 F. Supp. 3d 73, 79 (D.

Mass. 2016) (granting defendant's motion to dismiss for insufficient service of process that was

filed two months after defendant removed the case).

8.      Subject matter jurisdiction is based on the Court's diversity jurisdiction pursuant

to 28 U.S.C. § 1332(a), which provides the Court with "original jurisdiction of all civil actions

where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs, and is between . . . citizens of different states" or citizens of a state and a foreign state.

9.      For purposes of removal, venue is proper in the District of Massachusetts, Eastern

Division, because the state court action was filed in the Superior Court of Suffolk County. Thus,

this Court is the "the district court of the United States for the district and division embracing the

place where such action is pending." 28 U.S.C. § 1441(a). However, Defendants expressly reserve

the right to move for dismissal on the ground of (among other things) improper venue under

Federal Rule of Civil Procedure 12(b)(3), including based on the exclusive forum selection

provisions in Defendants' terms of service. *See Lambert v. Kysar*, 983 F.2d 1110, 1113 n.2 (1st

Cir. 1993) ("It is well settled that the filing of a removal petition in a diversity action, without

more, does not waive the right to object in federal court to the state court venue.").

## III.   GROUNDS FOR REMOVAL

10.     Removal of this case is proper under 28 U.S.C. §§ 1441(a), 1441(b), and 1332(a).

Together, these statutes allow for the removal of any civil action between "citizens of different

- 3 -

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG   Document 5   Filed 12/13/23   Page 102 of 108
Superior Court - Suffolk
Docket Number 2384CV02451        Case 1:23-cv-12878   Document 1   Filed 11/28/23   Page 4 of 10

states" or between citizens of a state and a foreign country where the amount in controversy exceeds $75,000, provided that no defendant "properly joined and served . . . is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). All requirements are met in this case.

### A.    Complete Diversity Exists between Plaintiff and Defendants

11.    For purposes of diversity jurisdiction, a corporation is a citizen of every state and foreign state in which it is incorporated and the one state or foreign state in which it maintains its principal place of business. 28 U.S.C. § 1332(c)(1); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010). The citizenship of a limited liability company ("LLC") "is determined by the citizenship of all of its members." *D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra*, 661 F.3d 124, 125 (1st Cir. 2011). Foreign limited companies that are the functional equivalent of a U.S. corporation "are treated as corporations for the purposes of diversity subject-matter jurisdiction." *See Banks v. Saba*, 2021 WL 4342098, at *9 (D. Mass. 2021); *Century Metal Recycling, Pvt. Ltd. v. Dacon Logistics, LLC*, 2013 WL 5929816, at *3 (D. Conn. 2013); *VistaJet Ltd. v. Paragon Jets LLC*, 2022 WL 431431, at *3 n.1 (E.D.N.Y. 2022) (treating Maltese limited company as foreign corporation for purposes of diversity jurisdiction). Foreign limited companies that are the functional equivalent of a U.S. LLC are treated as LLCs for the purposes of diversity jurisdiction. *See Century Metal Recycling, Pvt. Ltd.*, 2013 WL 5929816, at *3.

12.    Plaintiff is a Massachusetts LLC that was formed on October 17, 2023, less than two weeks before this lawsuit was filed. Plaintiff's Certificate of Organization, filed with the Secretary of the Commonwealth of Massachusetts on October 17, 2023, was signed by Theresa Donahue as the person "authorized to execute documents to be filed" by Plaintiff "with the Corporations Division." Ex. A, Compl. ¶¶ 19, 125–27; *see also id.*, Ex. B (Fair Gaming Advocates MA LLC Certification of Organization). On information and belief, Ms. Donahue is a domiciliary of Massachusetts and is the sole member of Plaintiff. Thus, for purposes of diversity jurisdiction,

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG   Document 5   Filed 12/13/23   Page 103 of 108
Superior Court - Suffolk
Docket Number 2384CV02451   Case 1:23-cv-12878   Document 1   Filed 11/28/23   Page 5 of 10

Plaintiff is a citizen of Massachusetts. *See D.B. Zwirn*, 661 F.3d at 125. But even if there are other members of Plaintiff besides Ms. Donahue, Defendants aver, on information and belief, that none of Plaintiff's members is a citizen of Australia, Malta, or Delaware.

13.     VGW Holdings is an Australian limited company, organized under the laws of Australia, incorporated in Australia, with its principal place of business in Australia. *See* Thunder Decl. ¶ 2. VGW Holdings is a public company.[1] *See id.* Thus, for the purposes of diversity jurisdiction, VGW Holdings is an Australian citizen. *See Banks*, 2021 WL 4342098, at *9 (D. Mass. 2021).

14.     VGW Malta is a Maltese limited company, organized under the laws of Malta, with its principal place of business in Malta. *See* Thunder Decl. ¶ 5. If, for purposes of diversity jurisdiction, VGW Malta were considered a foreign corporation, then VGW Malta is a citizen of Malta. 28 U.S.C. § 1332(c)(1); *see Banks*, 2021 WL 4342098, at *9; *VistaJet Limited*, 2022 WL 431431, at *3 n.1.

15.     If, however, VGW Malta were considered a foreign LLC for purposes of diversity jurisdiction and its citizenship were to be determined by the citizenship of each of its members, it would be a citizen of Australia, as depicted and explained below:



*\*Note: arrow points to entity's member(s).*

---

[1] An Australian limited company is the functional equivalent of a U.S. corporation for diversity purposes.

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG  Document 5  Filed 12/13/23  Page 104 of 108
Superior Court - Suffolk                Case 1:23-cv-12878  Document 1  Filed 11/28/23  Page 6 of 10
Docket Number 2384CV02451

16.    Defendant VGW Malta has two members: VGW Malta Holding Limited (a Maltese limited company) and VGW Corporation Pty. Ltd. (an Australian proprietary limited company). *See* Thunder Decl. ¶ 5.

17.    VGW Malta Holding Limited is a Maltese limited company, organized under the laws of Malta, with its principal place of business in Malta.  It has two members: VGW Corporation Pty. Ltd. (the Australian proprietary limited company) and VGW Holdings (an Australian public company). *See* Thunder Decl. ¶ 6.

18.    VGW Corporation Pty. Ltd. is an Australian proprietary limited company, organized under the laws of Australia, with its principal place of business in Australia.[2]  It has one member: VGW (the Australian public company). *See* Thunder Decl. ¶ 7.

19.    Because Defendant VGW Malta, if treated as a foreign LLC, takes on the citizenship of its members (VGW Malta Holding Limited and VGW Corporation Pty. Ltd.), which, in turn, each take on the citizenship of its members (ultimately, VGW Holdings), VGW Malta, if treated as an LLC, would be an Australian citizen for the purposes of diversity jurisdiction. *See Century Metal Recycling, Pvt. Ltd.*, 2013 WL 5929816, at *3.

20.    Finally, VGW Luckyland and VGW US are Delaware corporations with their principal place of business in Delaware. *See* Thunder Decl. ¶¶ 8, 9.  Thus, for purposes of diversity jurisdiction, VGW Luckyland and VGW US are citizens of Delaware.  28 U.S.C. § 1332(c)(1).

21.    Accordingly, complete diversity exists here because no plaintiff and no defendant are citizens of the same state.  Removal is therefore proper pursuant to 28 U.S.C. §§ 1441 and 1332(a).

---

[2] An Australian proprietary limited company is the functional equivalent of a U.S. LLC for diversity purposes.

**B.    The Amount in Controversy Exceeds $75,000**

22.    The "amount in controversy" element requires that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a).

23.    In determining whether the amount of controversy requirement is satisfied, a plaintiff's "general allegation of damages that meet the amount requirement suffices unless questioned by the opposing party or the court." *Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004). The removing defendant may submit evidence to establish that the amount in controversy requirement is satisfied. *See Barbosa v. Wells Fargo Bank, N.A.*, 2013 WL 4056180, at *3 (D. Mass. 2013) ("Since the jurisdictional amount is not facially apparent from the petition, the Court must 'look to the notice of removal and any other materials submitted by [defendant]' to determine if [defendant] has satisfied its burden.").

24.    Here, Plaintiff alleges in the state court complaint that "the damages sought by Plaintiff far exceed $50,000" (Ex. A, Compl. ¶ 17), and, in fact, that the amount at issue is likely multi millions of dollars (*see id.*, Compl. ¶ 13). Plaintiff asserts a claim under M.G.L. ch. 137 § 1 to recover for *itself*—and *only itself*—treble the amount allegedly spent by *all Massachusetts residents* to purchase "Gold Coins" and "Sweeps Coins" when playing Defendants' online casino-themed social games "more than three months and up to a year" preceding the filing of Plaintiff's lawsuit on October 30, 2023. *Id.*, Compl. ¶¶ 124–38 (asserting claim under M.G.L. ch. 137 § 1, which grants "any other person" the right to "sue for and recover in tort treble the value" of a losing gambler's losses where the losing gambler has not filed suit to recover his losses "within three months after such loss"); *id.*, Compl. ¶ 132 ("Plaintiff is now entitled to recover the monetary losses suffered by all Massachusetts residents lost from wagering at Defendants' games."); *see also Donovan*, 324 Mass. at 394 (limitations period for a third-party recovery claim under M.G.L. ch. 137 § 1 is one year).

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG Document 5 Filed 12/13/23 Page 106 of 108
Superior Court - Suffolk
Docket Number 2384CV02451 Case 1:23-cv-12878 Document 1 Filed 11/28/23 Page 8 of 10

25.     "Sweeps Coins" are not available for purchase at any time. However, the total amount spent by Massachusetts residents to purchase "Gold Coins" in Defendants' games from October 30, 2022, to October 30, 2023, exceeds $75,000. Thunder Decl. ¶ 14. Accordingly, the amount in controversy requirement for removal is satisfied. 28 U.S.C. § 1332(a).

### IV.     CONCLUSION

26.     As set forth above, removal is proper under 28 U.S.C. §§ 1332, 1441, and 1446 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

27.     By removing the state court action to this Court, Defendants reserve and do not waive any and all defenses, objections, or motions available to them under state or federal law, including any defenses under Rule 12 of the Federal Rules of Civil Procedure.

WHEREFORE, Defendants remove this action from the Superior Court of Suffolk County, Massachusetts, to the United States District Court for the District of Massachusetts, Eastern Division. This Notice has been served on all counsel of record on the date and manner stated in the Certificate of Service.

///

///

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG   Document 5   Filed 12/13/23   Page 107 of 108
Superior Court - Suffolk
Docket Number 2384CV02451       Case 1:23-cv-12878   Document 1   Filed 11/28/23   Page 9 of 10

Dated: November 28, 2023                    Respectfully Submitted,

                                            ORRICK, HERRINGTON & SUTCLIFFE LLP


                                            /s/ Matthew D. LaBrie
                                            Matthew D. LaBrie (BBO No. 693698)
                                            mlabrie@orrick.com
                                            222 Berkeley Street, Suite #2000
                                            Boston, MA 02116
                                            T:      +1 617 880 1800
                                            F:      +1 617 880 1801

                                            *Counsel for VGW Holdings Limited, VGW
                                            Malta Limited, VGW Luckyland, Inc., and VGW
                                            US, Inc.*

Date Filed 11/28/2023 1:35 PM Case 1:23-cv-12878-NMG   Document 5   Filed 12/13/23   Page 108 of 108
Superior Court - Suffolk
Docket Number 2384CV02451      Case 1:23-cv-12878   Document 1   Filed 11/28/23   Page 10 of 10

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of November 2023, the foregoing document was

served on counsel of record for Plaintiff Fair Gaming Advocates MA LLC, listed below, via email

and certified mail:

Quinn Heath, Esq.
476 Windsor Street #1
Cambridge, MA 02141
Quinn@MensingGroup.com

*Counsel for Fair Gaming Advocates MA LLC*

/s/ Matthew D. LaBrie
Matthew D. LaBrie

- 10 -